Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/23/2022 09:08 AM CDT

State of Nebraska, appellee, v.
John L. Lotter, appellant.

___ N.W.2d ___

Filed July 1, 2022.    Nos. S-20-363, S-20-366, S-20-367.

1.  **Postconviction: Constitutional Law: Appeal and Error.** In appeals
    from postconviction proceedings, an appellate court reviews de novo a
    determination that the defendant failed to allege sufficient facts to dem-
    onstrate a violation of his or her constitutional rights or that the record
    and files affirmatively show that the defendant is entitled to no relief.
2.  **Postconviction: Judgments: Appeal and Error.** Whether a claim
    raised in a postconviction proceeding is procedurally barred is a ques-
    tion of law which an appellate court reviews independently of the lower
    court's ruling.
3.  **Limitations of Actions.** If the facts in a case are undisputed, the issue
    as to when the statute of limitations begins to run is a question of law.
4.  **Postconviction: Constitutional Law.** Postconviction relief is a very
    narrow category of relief, available only to remedy prejudicial constitu-
    tional violations that render the judgment void or voidable.
5.  **Postconviction: Constitutional Law: Proof.** A postconviction motion
    must allege facts which, if proved, constitute a denial or violation of a
    defendant's rights under the U.S. or Nebraska Constitution, causing the
    judgment against the defendant to be void or voidable.
6.  ____: ____: ____. Under the Nebraska Postconviction Act, an eviden-
    tiary hearing is not required when (1) the motion does not contain fac-
    tual allegations which, if proved, constitute an infringement of the mov-
    ant's constitutional rights rendering the judgment void or voidable; (2)
    the motion alleges only conclusions of fact or law without supporting
    facts; or (3) the records and files affirmatively show that the defendant
    is entitled to no relief.
7.  **Postconviction.** The need for finality in the criminal process requires
    that a defendant bring all claims for relief at the first opportunity.

8. **Postconviction: Appeal and Error.** It is fundamental that a motion for postconviction relief cannot be used to secure review of issues which were known to the defendant and could have been litigated on direct appeal.

9. \_\_\_\_: \_\_\_\_. When an issue could have been raised on direct appeal, it is procedurally barred from postconviction relief, no matter how the issues may be phrased or rephrased.

10. **Postconviction: Pleadings.** The effect of Neb. Rev. Stat. § 29-3001(3) (Reissue 2016) is to require that all available grounds for postconviction relief must be stated in the initial postconviction motion and, once that motion has been judicially determined, any subsequent postconviction motion regarding the same conviction and sentence may be dismissed by the district court unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time of filing the prior motion.

11. \_\_\_\_: \_\_\_\_. A defendant is entitled to bring a successive postconviction motion only when the face of the motion affirmatively shows that the issues raised therein could not have been raised in prior motions.

12. **Postconviction: Limitations of Actions: Sentences: Death Penalty.** The 1-year limitation period set out in Neb. Rev. Stat. § 29-3001(4) (Reissue 2016) governs all postconviction motions, including successive motions and those challenging a death sentence.

13. **Postconviction.** For purposes of Neb. Rev. Stat. § 29-3001(4)(b) (Reissue 2016), the factual predicate for a postconviction claim is properly understood as the important objective facts that support the claim.

14. **Postconviction: Time.** The 1-year period in Neb. Rev. Stat. § 29-3001(4)(b) (Reissue 2016) begins to run when the objective facts underlying the claim could reasonably be discovered, and that date is distinct from discovering that those facts are actionable.

15. \_\_\_\_: \_\_\_\_. The inquiry for purposes of Neb. Rev. Stat. § 29-3001(4)(b) (Reissue 2016) concerns when the important objective facts could reasonably have been discovered, not when the claimant should have discovered the legal significance of those facts.

16. **Mental Competency.** The factual predicate for an intellectual disability claim under *Atkins v. Virginia,* 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 335 (2002), does not depend on either a formal clinical diagnosis or a particular intelligence quotient score.

17. \_\_\_\_. The important objective facts supporting a claim of intellectual disability under *Atkins v. Virginia,* 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 335 (2002), include facts relating to subaverage intellectual functioning, deficits in adaptive functioning, and the onset of these deficits during the developmental period.

18. **Mental Competency: Presumptions.** The plain language of Neb. Rev. Stat. § 28-105.01(3) (Cum. Supp. 2020) does not establish a strict cutoff score of 70 on an intelligence quotient test; rather, it creates an evidentiary presumption in favor of finding intellectual disability when the defendant has an intelligence quotient score of 70 or below on a reliably administered test.

19. **Mental Competency: Evidence: Appeal and Error.** Nebraska appellate courts have not construed Neb. Rev. Stat. § 28-105.01(3) (Cum. Supp. 2020) in a way that would prohibit those with a score above 70 on an intelligence quotient test from presenting other evidence that would support a finding of intellectual disability.

20. **Constitutional Law: Sentences.** Generally, state courts considering a matter on collateral review must give retroactive effect to new substantive rules of federal constitutional law. Substantive rules of federal constitutional law include rules forbidding criminal punishment of certain primary conduct, as well as rules prohibiting a certain category of punishment for a class of defendants because of their status or offense.

21. **Postconviction: Constitutional Law: Time.** Neither *Hall v. Florida*, 572 U.S. 701, 134 S. Ct. 1986, 188 L. Ed. 1007 (2014), nor *Moore v. Texas*, ___ U.S. ___, 137 S. Ct. 1039, 197 L. Ed. 2d 416 (2017), announced a new substantive rule of constitutional law that must be applied retroactively to cases on postconviction collateral review.

22. **Postconviction: Death Penalty: Time.** The holding in *Sawyer v. Whitley*, 505 U.S. 333, 112 S. Ct. 2514, 120 L. Ed. 2d 269 (1992), does not require a state court to excuse procedural defaults in postconviction cases or prevent a state court from enforcing its procedural or time bar rules when presented with a challenge to imposition of the death penalty on postconviction collateral review.

23. **Postconviction: Time: Appeal and Error.** Generally, when the timeliness of a postconviction motion is at issue, the defendant must raise all applicable arguments in the district court to preserve them for appellate review.

24. **Statutes: Legislature: Intent.** When construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.

25. **Statutes: Appeal and Error.** The rules of statutory interpretation require an appellate court to give effect to the entire language of a statute, and to reconcile different provisions of the statutes so they are consistent, harmonious, and sensible.

26. **Death Penalty: Sentences: Mental Competency: Statutes: Legislature: Pleadings.** Neb. Rev. Stat. § 28-105.01(2) (Cum. Supp. 2020) establishes a statutory right prohibiting imposition of the death

penalty on any person with an intellectual disability. To enforce that statutory right, the Legislature enacted a specific statutory procedure to allow a defendant facing the death penalty to file a verified motion and request a hearing to determine intellectual disability, before any sentencing determination is made.

27. **Statutes: Legislature: Intent: Words and Phrases.** As a general principle of statutory construction, use of the phrase "notwithstanding any other provision of law" in a statute signals legislative intent to override other provisions of law that conflict with the statute.

28. **Postconviction: Limitations of Actions: Words and Phrases.** The phrase "notwithstanding any other provision of law" in Neb. Rev. Stat. § 28-105.01 (Cum. Supp. 2020) neither impacts nor overrides the procedural and time limitations applicable to postconviction motions under the Nebraska Postconviction Act.

29. **Death Penalty: Legislature: Initiative and Referendum.** The Legislature's repeal of the death penalty in 2015 Neb. Laws, L.B. 268, never went into effect, because upon the filing of a referendum petition appearing to have a sufficient number of signatures, operation of the legislative act was suspended so long as the verification and certification process ultimately determines that the petition had the required number of valid signatures.

30. **Death Penalty: Sentences: Initiative and Referendum.** Because 2015 Neb. Laws, L.B. 268, was suspended and never went into effect, any death sentences in effect at the time were unchanged.

Appeal from the District Court for Richardson County: VICKY L. JOHNSON, Judge. Affirmed.

Timothy S. Noerrlinger, of Naylor & Rappl, and Rebecca E. Woodman, pro hac vice, for appellant.

Douglas J. Peterson, Attorney General, and James D. Smith, Senior Assistant Attorney General, for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, and PAPIK, JJ.

STACY, J.

In this successive motion for postconviction relief, John L. Lotter presents two claims challenging the constitutionality

of his death sentences. His first claim alleges the sentences were effectively vacated, and then unconstitutionally "reimposed," as a result of the legislative process surrounding L.B. 268—a bill passed by the Nebraska Legislature in 2015[1] and repealed by public referendum thereafter. We refer to this as Lotter's "L.B. 268 claim." His second claim alleges that he was diagnosed as intellectually disabled in 2018 and, therefore, is ineligible for imposition of the death penalty under the U.S. Supreme Court's holding in *Atkins v. Virginia*.[2] We refer to this as Lotter's "*Atkins* claim."

The district court denied postconviction relief on both of Lotter's claims without conducting an evidentiary hearing. It determined the L.B. 268 claim was meritless under settled precedent. It did not reach the merits of the *Atkins* claim because it determined the claim was both procedurally barred and time barred under Nebraska postconviction law.

Lotter appeals, arguing he was entitled to an evidentiary hearing on both claims. We affirm.

## I. BACKGROUND

In 1995, a jury convicted Lotter of three counts of first degree murder, three counts of use of a weapon to commit a felony, and one count of burglary.[3] He was sentenced to death for each murder conviction and to terms of incarceration on the convictions for burglary and use of a weapon.[4] On direct appeal, the burglary conviction was vacated and all other convictions and sentences were affirmed.[5] Lotter's criminal

---

[1] See 2015 Neb. Laws, L.B. 268.

[2] *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

[3] See *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified on denial of rehearing* 255 Neb. 889, 587 N.W.2d 673 (1999), *cert. denied* 526 U.S. 1162, 119 S. Ct. 2056, 144 L. Ed. 2d 222.

[4] *Id.*

[5] *Id*.

judgments became final on June 7, 1999, when the U.S. Supreme Court denied his petition for writ of certiorari.[6]

Between 1999 and 2017, Lotter filed four motions for post-conviction relief, all of which were found to be meritless.[7] In addition, Lotter filed an unsuccessful motion for postconviction DNA testing in 2001,[8] and unsuccessful petitions for federal habeas corpus relief in 2011[9] and 2017.[10] None of Lotter's prior postconviction motions alleged a claim that he is intellectually disabled under *Atkins*.

On March 27, 2018, Lotter filed, in each of his three criminal cases, the operative motions for postconviction relief at issue in this appeal. The verified motions were identical, and the district court consolidated them and generally referred to them collectively as Lotter's fifth postconviction motion. For ease of reference, we do the same.

As stated, Lotter's fifth postconviction motion alleges two grounds for relief. Lotter's L.B. 268 claim alleges that in 2015, when the Legislature passed L.B. 268 abolishing the death penalty, it effectively vacated his death sentences and imposed life sentences. Lotter alleges that when L.B. 268 was subsequently repealed by public referendum, it resulted in "re-imposition" of his death sentences, which violated his

---

[6] *Id*.

[7] See, *State v. Lotter*, 301 Neb. 125, 917 N.W.2d 850 (2018) (affirming denial of postconviction motions filed in 2017); *State v. Lotter*, case Nos. S-12-837 through S-12-839 (2013) (summarily affirming denial of postconviction motions filed in 2012); *State v. Lotter*, 278 Neb. 466, 771 N.W.2d 551 (2009) (affirming denial of postconviction motions filed in 2007); *State v. Lotter*, 266 Neb. 245, 664 N.W.2d 892 (2003), (superseded by statute as stated in *State v. Harris*, 292 Neb. 186, 871 N.W.2d 762 (2015); affirming denial of amended postconviction motions filed in 1999; and affirming denials of motions for new trial and petitions for writ of error coram nobis filed in 1999).

[8] *State v. Lotter*, 266 Neb. 758, 669 N.W.2d 438 (2003).

[9] *Lotter v. Houston*, 771 F. Supp. 2d 1074 (D. Neb. 2011).

[10] *Lotter v. Britten*, No. 4:04CV3187, 2017 WL 744554 (D. Neb. Feb. 24, 2017).

constitutional right to due process, violated his constitutional right to be free from cruel and unusual punishment, and amounted to an unconstitutional bill of attainder.

Lotter's *Atkins* claim alleges that in March 2018, his attorney retained Ricardo Weinstein, Ph.D., to determine whether Lotter is intellectually disabled. After evaluating Lotter's intellectual and adaptive functioning, Weinstein issued a report concluding that Lotter "qualifies for the diagnosis of Intellectual Developmental Disability (formerly Mental Retardation)." On March 27, 2018, Lotter amended his fifth postconviction motion to add a claim that he is constitutionally ineligible for imposition of the death penalty under *Atkins*.[11] A copy of Weinstein's report was attached as an exhibit to the operative motion.

In February 2020, the court held what was characterized as a records hearing[12] on Lotter's fifth postconviction motion. Thereafter, the court entered an order denying postconviction relief on both claims without conducting an evidentiary hearing. In rejecting Lotter's L.B. 268 claim, the district court relied on several recent postconviction opinions from this court rejecting nearly identical claims as meritless.[13] Based on that precedent, the court concluded as a matter of law that Lotter's L.B. 268 claim did not entitle him to postconviction relief.

The court did not address the merits of Lotter's *Atkins* claim, because it determined the claim was both procedurally

---

[11] *Atkins, supra* note 2.

[12] See *State v. Glover*, 276 Neb. 622, 756 N.W.2d 157 (2008) (recognizing district court has discretion to hold records hearing to receive existing files and records before deciding whether to grant or deny evidentiary hearing on motion for postconviction relief).

[13] See, *State v. Torres*, 304 Neb. 753, 936 N.W.2d 730 (2020), *cert. denied* ___ U.S. ___, 141 S. Ct. 295, 208 L. Ed. 2d 50; *State v. Mata*, 304 Neb. 326, 934 N.W.2d 475 (2019), *cert. denied* ___ U.S. ___, 141 S. Ct. 167, 207 L. Ed. 2d 1101 (2020); *State v. Jenkins*, 303 Neb. 676, 931 N.W.2d 851 (2019), *cert. denied* ___ U.S. ___, 140 S. Ct. 2704, 206 L. Ed. 2d 844 (2020).

barred and time barred under Nebraska postconviction law. The court found the claim was procedurally barred because Lotter had not raised it in any of his postconviction motions filed after 2002, when *Atkins* announced the constitutional rule that criminals who are intellectually disabled are ineligible for imposition of the death penalty.

The court found that Lotter's *Atkins* claim was time barred under Neb. Rev. Stat. § 29-3001(4) (Reissue 2016), because it had not been filed within 1 year from any of the five triggering events identified in that statute. More specifically, the court rejected Lotter's argument that his *Atkins* claim was timely under § 29-3001(4)(b), reasoning that Lotter could have, with reasonable diligence, discovered the factual predicate for his *Atkins* claim more than 1 year before he filed the fifth postconviction motion. The court also rejected Lotter's argument that his *Atkins* claim was timely under § 29-3001(4)(d), which requires that a postconviction claim be filed within 1 year from "[t]he date on which a constitutional claim asserted was initially recognized by the Supreme Court of the United States or the Nebraska Supreme Court . . . ." The court reasoned that Lotter's claim was based on the constitutional right first announced nearly 20 years ago in *Atkins*, and it rejected Lotter's contention that his claim was based on a new constitutional right recognized in the 2017 case of *Moore v. Texas (Moore I)*,[14] a case we discuss later in our analysis.

After concluding that neither of the claims presented in Lotter's fifth postconviction motion entitled him to relief, the court denied the motion without an evidentiary hearing. Lotter filed this timely appeal.

## II. ASSIGNMENT OF ERROR

Lotter assigns, consolidated and restated, that the district court erred by not granting an evidentiary hearing on both of the claims alleged in his fifth successive motion for postconviction relief.

---

[14] *Moore v. Texas*, ___ U.S. ___, 137 S. Ct. 1039, 197 L. Ed. 2d 416 (2017).

## III. STANDARD OF REVIEW

[1] In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief.[15]

[2,3] Whether a claim raised in a postconviction proceeding is procedurally barred is a question of law which an appellate court reviews independently of the lower court's ruling.[16] Similarly, if the facts in a case are undisputed, the issue as to when the statute of limitations begins to run is a question of law.[17]

## IV. ANALYSIS

To address Lotter's assignments of error, we begin by reviewing the legal standards, both substantive and procedural, which govern proceedings under the Nebraska Postconviction Act.[18]

### 1. Standards Governing
### Postconviction Relief

[4,5] In Nebraska, postconviction relief is a very narrow category of relief, available only to remedy prejudicial constitutional violations that render the judgment void or voidable.[19] Under the postconviction statutes, defendants in custody under sentence "may file a verified motion, in the court which imposed such sentence, stating the grounds relied upon and asking the court to vacate or set aside the sentence."[20] Such a motion must allege facts which, if proved, constitute a

---

[15] *State v. Torres*, 300 Neb. 694, 915 N.W.2d 596 (2018).

[16] *Mata, supra* note 13.

[17] *Torres, supra* note 15.

[18] See Neb. Rev. Stat. §§ 29-3001 to 29-3004 (Reissue 2016).

[19] *State v. Combs*, 308 Neb. 587, 955 N.W.2d 322 (2021).

[20] § 29-3001(1).

denial or violation of his or her rights under the U.S. or Nebraska Constitution, causing the judgment against the defendant to be void or voidable.[21]

[6] The Nebraska Postconviction Act requires a court to grant a prompt hearing on a motion for postconviction relief "[u]nless the motion and the files and records of the case show to the satisfaction of the court that the prisoner is entitled to no relief . . . ."[22] Under this standard, an evidentiary hearing is not required when (1) the motion does not contain factual allegations which, if proved, constitute an infringement of the movant's constitutional rights rendering the judgment void or voidable; (2) the motion alleges only conclusions of fact or law without supporting facts; or (3) the records and files affirmatively show that the defendant is entitled to no relief.[23]

In addition to the substantive rules governing postconviction relief, there are procedural rules which can bar postconviction relief regardless of the merits of a particular claim. Here, the district court determined that Lotter's *Atkins* claim was both procedurally barred and time barred under Nebraska law. We recite the general principles governing procedural bars and time bars in the next two sections of this opinion, and apply those principles later in our analysis.

### (a) Procedural Limitations on Postconviction Relief

[7-9] The need for finality in the criminal process requires that a defendant bring all claims for relief at the first opportunity.[24] Therefore, it is fundamental that a motion for postconviction relief cannot be used to secure review of issues

---

[21] *State v. Martinez*, 302 Neb. 526, 924 N.W.2d 295 (2019); *State v. Taylor*, 300 Neb. 629, 915 N.W.2d 568 (2018).

[22] § 29-3001(2).

[23] See, *State v. Munoz*, 309 Neb. 285, 959 N.W.2d 806 (2021); *State v. Malone*, 308 Neb. 929, 957 N.W.2d 892 (2021), *modified on denial of rehearing* 309 Neb. 399, 959 N.W.2d 818.

[24] *State v. Lotter*, 278 Neb. 466, 771 N.W.2d 551 (2009).

which were known to the defendant and could have been litigated on direct appeal.[25] We have explained that when an issue could have been raised on direct appeal, it is procedurally barred from postconviction relief,[26] no matter how the issues may be phrased or rephrased.[27]

[10,11] Additionally, the statute governing postconviction relief expressly provides that a "court need not entertain a second motion or successive motions for similar relief on behalf of the same prisoner."[28] We have long construed this provision to require that all available grounds for postconviction relief must be stated in the initial postconviction motion and, once that motion has been judicially determined, any subsequent postconviction motion regarding the same conviction and sentence may be dismissed by the district court unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time of filing the prior motion.[29] Stated differently, a defendant is entitled to bring a successive postconviction motion only when the face of the motion affirmatively shows that the issues raised therein could not have been raised in prior motions.[30] In the

---

[25] *Id.*

[26] See *Mata, supra* note 13.

[27] See *State v. Otey*, 236 Neb. 915, 464 N.W.2d 352 (1991).

[28] § 29-3001(3).

[29] See *State v. Reichel*, 187 Neb. 464, 191 N.W.2d 826 (1971). See, also, *State v. Watkins*, 284 Neb. 742, 746, 825 N.W.2d 403, 406 (2012) (holding "court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion"); *State v. Ryan*, 257 Neb. 635, 601 N.W.2d 473 (1999).

[30] See *Lotter, supra* note 24, 278 Neb. at 477, 771 N.W.2d at 561 (finding Lotter's constitutional claim based on allegation of perjured trial testimony was procedurally barred because "Lotter fails to allege that this evidence was unavailable before any of the numerous challenges already made to his convictions and sentences"). See, also, *State v. Jackson*, 296 Neb. 31, 892 N.W.2d 67 (2017); *State v. Marshall*, 272 Neb. 924, 725 N.W.2d 834 (2007); *State v. Ortiz*, 266 Neb. 959, 670 N.W.2d 788 (2003).

absence of such affirmative allegations, there is "no justification for allowing a prisoner to continue litigation endlessly by piecemeal post conviction attacks on his conviction and sentence."[31] A prisoner cannot wait to see if some postconviction claims will succeed and, when they do not, dust off other claims and subsequently attempt to litigate them.[32]

(b) Time Limitations on
Postconviction Claims

In 2011, the Legislature amended the Nebraska Postconviction Act to establish a 1-year limitations period for filing postconviction motions.[33] Section 29-3001(4) of the act provides:

(4) A one-year period of limitation shall apply to the filing of a verified motion for postconviction relief. The one-year limitation period shall run from the later of:

(a) The date the judgment of conviction became final by the conclusion of a direct appeal or the expiration of the time for filing a direct appeal;

(b) The date on which the factual predicate of the constitutional claim or claims alleged could have been discovered through the exercise of due diligence;

(c) The date on which an impediment created by state action, in violation of the Constitution of the United States or the Constitution of Nebraska or any law of this state, is removed, if the prisoner was prevented from filing a verified motion by such state action;

(d) The date on which a constitutional claim asserted was initially recognized by the Supreme Court of the United States or the Nebraska Supreme Court, if the newly recognized right has been made applicable retroactively to cases on postconviction collateral review; or

(e) August 27, 2011.

---

[31] *Reichel, supra* note 29, 187 Neb. at 467, 191 N.W.2d at 828.

[32] See *Ryan, supra* note 29.

[33] See 2011 Neb. Laws, L.B. 137, § 1, now codified at § 29-3001(4).

[12] The 1-year limitation period set out in § 29-3001(4) governs all postconviction motions, including successive motions[34] and those challenging a death sentence.[35]

With this substantive and procedural framework in mind, we address Lotter's assignments of error. Because Lotter's primary arguments on appeal pertain to his *Atkins* claim, we address that claim first.

## 2. Lotter's *Atkins* Claim

Lotter argues the district court erred by failing to grant him an evidentiary hearing on his *Atkins* claim. As stated, the district court denied an evidentiary hearing on Lotter's *Atkins* claim after determining it was both procedurally barred and time barred under Nebraska law.

To avoid being procedurally barred, the face of Lotter's fifth postconviction motion must affirmatively show that his *Atkins* claim could not have been raised in any of his prior postconviction motions.[36] And to avoid being time barred under § 29-3001(4), Lotter's *Atkins* claim must have been filed within 1 year from one of the triggering events in that statute.

As we read Lotter's fifth postconviction motion, he asserts three reasons why his *Atkins* claim is not procedurally barred or time barred. The first two are somewhat interrelated, in that he argues the face of his fifth successive motion affirmatively shows he could not have raised an *Atkins* claim in any of his prior postconviction motions because (1) the factual predicate for his claim did not exist until he was diagnosed as intellectually disabled in March 2018[37] and/or (2) he could not have known he had a viable *Atkins* claim until the U.S. Supreme released its opinion in *Moore I*.[38] Alternatively, Lotter's

---

[34] See *Torres, supra* note 15.

[35] See, e.g., *id*.; *Mata, supra* note 13; *Lotter, supra* note 7.

[36] See *Lotter, supra* note 24. See, also, *Jackson, supra* note 30; *Marshall, supra* note 30; *Ortiz, supra* note 30.

[37] See § 29-3001(4)(b).

[38] See § 29-3001(4)(d). See, also, *Moore I, supra* note 14.

motion asserts that because he has been diagnosed as intellectually disabled, he can overcome Nebraska's procedural and time bars by asserting a claim of "'actual innocence'" under the U.S. Supreme Court's holding in *Sawyer v. Whitley*.[39]

For the sake of completeness, we also note that Lotter's appellate briefing presents an issue which was not expressly alleged in his fifth postconviction motion: He asserts that the language of Neb. Rev. Stat. § 28-105.01(2) (Cum. Supp. 2020), which states, "Notwithstanding any other provision of law, the death penalty shall not be imposed upon any person with an intellectual disability," effectively exempts an *Atkins* claim from all of the procedural and time limitations set out in the Nebraska Postconviction Act, and allows such a claim to be raised at any time.

To analyze Lotter's arguments, we begin with a review of the U.S. Supreme Court cases recognizing and refining the constitutional rule that forbids imposing the death penalty on those who are intellectually disabled. We then review Nebraska's statute and case law defining intellectual disability for purposes of imposing the death penalty.

### (a) U.S. Supreme Court Precedent

In the 2002 case of *Atkins*,[40] the U.S. Supreme Court first held that imposing the death penalty on "mentally retarded criminals" amounts to cruel and unusual punishment prohibited by the Eighth Amendment. The clinical term "mental retardation" has since been changed to "intellectual disability,"[41]

---

[39] *Sawyer v. Whitley*, 505 U.S. 333, 339, 112 S. Ct. 2514, 120 L. Ed. 2d 269 (1992).

[40] *Atkins, supra* note 2, 536 U.S. at 321.

[41] See, *Hall v. Florida*, 572 U.S. 701, 704, 134 S. Ct. 1986, 188 L. Ed. 2d 1007 (2014) (citing "Rosa's Law, 124 Stat. 2643," which changed entries in U.S. Code from "'mental retardation'" to "'intellectual disability'"); Robert L. Schalock et al., *The Renaming of* Mental Retardation*: Understanding the Change to the Term* Intellectual Disability, 45 Intellectual and Developmental Disabilities 116 (2007); American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 33 (5th ed. 2013).

and this opinion uses the current clinical term unless quoting directly from earlier opinions.

The majority in *Atkins* acknowledged that just a decade earlier, in its 1989 opinion in *Penry v. Lynaugh*,[42] it found "insufficient evidence of a national consensus against executing mentally retarded people convicted of capital offenses for us to conclude that it is categorically prohibited by the Eighth Amendment." But *Atkins* observed that in the years following *Penry*, Congress and at least 18 state legislatures, including Nebraska's, had enacted laws generally "prohibiting the execution of mentally retarded persons."[43] The *Atkins* majority viewed that as a national legislative consensus that "death is not a suitable punishment for a mentally retarded criminal."[44] The majority concluded that imposing the death penalty on this class of offenders did not further the goals of deterrence or retribution underpinning the death penalty, and it found "no reason to disagree with the judgment of 'the legislatures that have recently addressed the matter.'"[45] *Atkins* therefore announced a new constitutional rule which categorically forbids imposing the death penalty on persons who are intellectually disabled.

However, the majority in *Atkins* did not adopt a specific test for determining which offenders are intellectually disabled, observing there was not yet a "national consensus" on that question.[46] Instead, *Atkins* expressly left to the states "'the task of developing appropriate ways to enforce the constitutional restriction.'"[47] But the *Atkins* majority emphasized that when states are defining intellectual disability, they

---

[42] *Penry v. Lynaugh*, 492 U.S. 302, 335, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989), abrogated, *Atkins, supra* note 2.

[43] *Atkins, supra* note 2, 536 U.S. at 315.

[44] *Id.*, 536 U.S. at 321.

[45] *Id*.

[46] See *id.*, 536 U.S. at 317.

[47] *Id*.

should be guided by current "clinical definitions of mental retardation."[48] *Atkins* cited to clinical definitions promulgated by the American Psychiatric Association in its "Diagnostic and Statistical Manual of Mental Disorders" and the American Association of Mental Retardation (subsequently named "American Association on Intellectual and Developmental Disabilities"),[49] which *Atkins* summarized as defining "mental retardation [to] require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that manifest before age 18."[50]

In the decades since *Atkins* was decided, the U.S. Supreme Court has issued three opinions considering challenges to the sufficiency of a state's definition of "intellectual disability" under the constitutional rule announced in *Atkins*.[51] In each post-*Atkins* case, the Court measured the state's definition of intellectual disability against the current clinical definitions and the medical community's diagnostic framework, which it has consistently described as having three criteria: "[1] significantly subaverage intellectual functioning, [2] deficits in adaptive functioning[,] and [3] onset of these deficits during the developmental period."[52] Because Lotter relies on at

---

[48] *Id.*, 536 U.S. at 318.

[49] *Id.*, 536 U.S. at 308, n.3.

[50] *Id.*, 536 U.S. at 318.

[51] *Moore v. Texas*, ___ U.S. ___, 139 S. Ct. 666, 203 L. Ed. 2d 1 (2019); *Moore I, supra* note 14; *Hall, supra* note 41.

[52] *Hall, supra* note 41, 572 U.S. at 710. Accord *Moore I, supra* note 14, 137 S. Ct. at 1045 (describing "the generally accepted, uncontroversial intellectual-disability diagnostic definition" as having "three core elements: (1) intellectual-functioning deficits . . . ; (2) adaptive deficits . . . ; and (3) the onset of these deficits while still a minor"); *Moore, supra* note 51, 139 S. Ct. at 668 ("[t]o make a finding of intellectual disability, a court must see: (1) deficits in intellectual functioning—primarily a test-related criterion . . . ; (2) adaptive deficits, 'assessed using both clinical evaluation and individualized . . . measures,' . . . ; and (3) the onset of these deficits while the defendant was still a minor").

least one of these post-*Atkins* cases to argue that his intellectual disability claim could not have been filed sooner than 2018, we summarize those cases before addressing his arguments.

In the 2014 case of *Hall v. Florida*,[53] the Court examined Florida's statutory definition of intellectual disability, which appeared on its face to incorporate the diagnostic framework referenced in *Atkins*. But the Florida Supreme Court had construed the statutory definition to impose a strict intelligence quotient (IQ) cutoff score of 70, and, under that construction, defendants with an IQ above 70 were prohibited from presenting other evidence of intellectual disability, including evidence of adaptive deficits. *Hall* found that Florida's definition of intellectual disability, as interpreted by its courts, was unconstitutional to the extent it considered an IQ score to be final and conclusive evidence of a defendant's intellectual capacity. Such a construction, *Hall* explained, was not "informed by the views of medical experts,"[54] because the medical community does not support a fixed IQ cutoff, and instead "understand[s] that an IQ test score represents a range rather than a fixed number."[55] *Hall* instructed that when using IQ test scores "to asses a defendant's eligibility for the death penalty, a State must afford these test scores the same studied skepticism that those who design and use the tests do"[56] and therefore must take into account an IQ test's "'standard error of measurement'" or "SEM" range.[57] And when a defendant's IQ

---

[53] *Hall, supra* note 41, 572 U.S. at 711 (noting Florida statute defined intellectual disability as "'significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18'" and defined "'significantly subaverage general intellectual functioning'" as "'performance that is two or more standard deviations from the mean score on a standardized intelligence test'").

[54] *Id.*, 572 U.S. at 721.

[55] *Id.*, 572 U.S. at 723.

[56] *Id.*

[57] *Id.*, 572 U.S. at 722.

score falls within the test's acknowledged margin of error, the defendant must be allowed to present additional evidence of intellectual disability, including testimony regarding adaptive deficits. The *Hall* majority stated that the "legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework."[58] The majority in *Hall* stopped short of holding that a state's definition of intellectual disability will not satisfy the principles of *Atkins* unless it complies in all respects with the current diagnostic criteria employed by psychiatric professionals, but it again emphasized that courts may "not disregard these informed assessments."[59]

In the 2017 case of *Moore I*, the U.S. Supreme Court considered the sufficiency of the definition used by the Texas Court of Criminal Appeals (Texas CCA) to find the defendant was not intellectually disabled.[60] The Supreme Court was critical of the definition applied by the Texas CCA, because it departed from the accepted clinical standards discussed in *Atkins* and *Hall*.[61] Among other shortcomings, the Texas definition relied on outdated lay perceptions and lay stereotypes to determine who was intellectually disabled. And when assessing deficits in adaptive functioning, the definition deviated from prevailing clinical standards by overemphasizing adaptive strengths. Based on these and other shortcomings, the Supreme Court held that the definition of intellectual disability relied upon by the Texas CCA created an unacceptable risk that the death penalty would be imposed on persons with intellectual disabilities, in violation of *Atkins*. *Moore I* therefore vacated the defendant's death sentence and remanded the matter for further proceedings in accordance with the opinion.

---

[58] *Id*., 572 U.S. at 721.

[59] *Id*.

[60] *Moore I, supra* note 14.

[61] *Id*., 137 S. Ct. at 1044 (admonishing that courts do not have "leave to diminish the force of the medical community's consensus" when construing statutory definitions of intellectual disability).

On remand, the Texas CCA reevaluated the evidence and again concluded the defendant did not meet the definition of an intellectually disabled person. The U.S. Supreme Court reversed that decision in *Moore v. Texas* (*Moore II*),[62] reasoning that on remand, the Texas CCA may have used different language, but much of its analysis suffered from the same shortcomings identified in *Moore I.* The Supreme Court therefore not only reversed the judgment of the Texas CCA, but affirmatively held that the defendant had shown he was a person with an intellectual disability and thus was ineligible for imposition of the death penalty under *Atkins*.

### (b) Nebraska's Definition of
### Intellectual Disability

In 1998, while Lotter's case was pending on direct appeal, the Nebraska Legislature amended § 28-105.01 to provide: "Notwithstanding any other provision of law, the death penalty shall not be imposed upon any person with mental retardation."[63] This statute was referenced in *Atkins* to support the Court's finding of a national legislative consensus that "the mentally retarded should be categorically excluded from execution."[64] In 2013, the language of § 28-105.01(2) was amended to use the current clinical term "intellectual disability" instead of "mental retardation."[65] Currently, the relevant provisions of § 28-105.01 provide:

> (2) Notwithstanding any other provision of law, the death penalty shall not be imposed upon any person with an intellectual disability;
>
> (3) As used in subsection (2) of this section, intellectual disability means significantly subaverage general intellectual functioning existing concurrently with

---

[62] *Moore II, supra* note 51.

[63] 1998 Neb. Laws, L.B. 1266, § 2, codified at § 28-105.01(2) (Cum. Supp. 1998).

[64] *Atkins, supra* note 2, 536 U.S. at 318.

[65] See 2013 Neb. Laws, L.B. 23.

deficits in adaptive behavior. An [IQ] of seventy or below on a reliably administered [IQ] test shall be presumptive evidence of intellectual disability.

(4) If (a) a jury renders a verdict finding the existence of one or more aggravating circumstances . . . the court shall hold a hearing prior to any sentencing determination proceeding . . . upon a verified motion of the defense requesting a ruling that the penalty of death be precluded under subsection (2) of this section. If the court finds, by a preponderance of the evidence, that the defendant is a person with an intellectual disability, the death sentence shall not be imposed.

Our 2010 opinion in *State v. Vela*[66] is the only case to date where we have applied the definition of intellectual disability in § 28-105.01(3). In *Vela*, the defendant was convicted of five counts of first degree murder. After the jury found the existence of aggravating circumstances,[67] the defendant filed a verified motion using the procedure in § 28-105.01(4)(a), seeking a ruling that he was intellectually disabled and therefore ineligible for imposition of the death penalty. After an evidentiary hearing, the district court found the defendant had proved "significantly subaverage general intellectual functioning"[68] because the evidence showed he had a full-scale IQ test score of 75 on a reliably administered test and, adjusted for the SEM, the court considered that a score in a "'range between 75 and 70.'"[69] But the district court found the defendant failed to prove, by a preponderance of the evidence,[70] that he also had significant "deficits in adaptive behavior."[71] The court therefore overruled the motion, after

---

[66] *State v. Vela*, 279 Neb. 94, 777 N.W.2d 266 (2010).

[67] See Neb. Rev. Stat. § 29-2520 (Cum. Supp. 2020).

[68] § 28-105.01(3).

[69] *Vela, supra* note 66, 279 Neb. at 146, 777 N.W.2d at 304.

[70] See § 28-105.01(4).

[71] § 28-105.01(3).

which a three-judge panel imposed a sentence of death on each conviction.

On direct appeal, we found no error in the district court's conclusion that the defendant failed to prove he was intellectually disabled for purposes of § 28-105.01(2). Our analysis focused primarily on the court's finding that the defendant had not proved the second factor of Nebraska's statutory test, relating to deficits in adaptive behavior. *Vela* was decided before *Hall* and both *Moore* cases, but our analysis relied on *Atkins* and appropriately emphasized the need to construe Nebraska's statutory factors in a manner consistent with "current clinical models."[72] *Vela* recognized that "[m]ental retardation is a clinical diagnosis"[73] and that "to reach any meaningful determination of whether a convicted defendant with an IQ in the low 70's is a person with mental retardation" courts must apply the current clinical diagnostic standards.[74]

With this jurisprudential and statutory background in mind, we summarize Lotter's allegations regarding his *Atkins* claim, after which we consider, de novo, whether that claim is procedurally barred or time barred.[75]

### (c) Lotter's Allegations of Intellectual Disability

Lotter's fifth successive postconviction motion alleged that in 2018, his attorney retained an expert to evaluate whether Lotter is intellectually disabled. The expert reviewed Lotter's records, conducted interviews, and administered testing to determine Lotter's current intellectual and adaptive functioning. In March 2018, the expert prepared a report concluding that Lotter "qualifies for the diagnosis of Intellectual Developmental Disability." Lotter attached that report to

---

[72] *Vela, supra* note 66, 279 Neb. at 149, 777 N.W.2d at 306.

[73] *Id*.

[74] *Id*. at 150, 777 N.W.2d at 306.

[75] See *Mata, supra* note 13.

his fifth postconviction motion. Among other things, the report states that in 2018, Lotter's full-scale IQ was 67, which the expert described as "consistent with mild intellectual disability." In addition to the IQ score, the report states that Lotter "has significant impairments in all three domains of adaptive functioning, including conceptual, social, and practical," and that "Lotter's problems are developmental in nature and were present since childhood." The report also states that when Lotter was approximately 10 years old, testing by his treating psychologist showed a full-scale IQ of 76. The State's briefing on appeal also directs us to historical evidence in the existing record regarding Lotter's IQ, including a defense witness who testified during the sentencing phase that Lotter's full-scale IQ was 92.

### (d) Lotter's Arguments

As stated, the district court concluded that Lotter's *Atkins* claim is procedurally barred because it could have been raised in any of his prior postconviction motions after *Atkins* was decided in 2002. Additionally, the court concluded the *Atkins* claim was time barred, rejecting Lotter's arguments it was timely under either § 29-3001(4)(b) or § 29-3001(4)(d).

On appeal, Lotter challenges the district court's conclusion that his *Atkins* claim is procedurally barred and time barred. He also argues that the procedural and time bars in the Nebraska Postconviction Act do not apply to an *Atkins* claim. We address each of Lotter's arguments in turn.

### (i) Lotter's Claim Not Timely Under § 29-3001(4)(b)

[13-15] Under § 29-3001(4)(b), a postconviction claim is timely if it is filed within 1 year of the date "on which the factual predicate of the constitutional claim or claims alleged could have been discovered through the exercise of due diligence." The factual predicate for a postconviction claim is properly understood as the "important objective facts" that

support the claim.[76] We have explained that the 1-year period in § 29-3001(4)(b) begins to run when the objective facts underlying the claim could reasonably be discovered, and that date is "distinct from discovering that those facts are actionable."[77] In other words, the inquiry for purposes of § 29-3001(4)(b) concerns when the important objective facts could reasonably have been discovered, not when the claimant should have discovered the legal significance of those facts.[78]

Lotter argues the factual predicate of his *Atkins* claim could not reasonably have been discovered until March 2018, when testing showed he had a full-scale IQ of 67 and an expert diagnosed him as intellectually disabled. For the same reason, Lotter argues he could not have raised an *Atkins* claim in any of his prior postconviction motions, and thus the claim should not be procedurally barred. We disagree.

[16,17] The factual predicate for an intellectual disability claim under *Atkins* does not depend on either a formal clinical diagnosis or a particular IQ score. Instead, the important objective facts supporting a claim of intellectual disability are those relating to the clinical diagnostic factors discussed in *Atkins* and the factors set out in § 28-105.01. As such, the factual predicate of an *Atkins* claim necessarily includes facts relating to subaverage intellectual functioning,[79] deficits in adaptive functioning,[80] and the "onset of these deficits during the developmental period."[81]

Our review of the existing record in this case belies Lotter's argument that he could not, with reasonable diligence, have discovered the important objective facts supporting an

---

[76] See *State v. Mamer*, 289 Neb. 92, 99, 853 N.W.2d 517, 524 (2014).

[77] See *id.*

[78] See *id.*

[79] See, *Atkins, supra* note 2; *Vela, supra* note 66. See, also, § 28-105.01(3).

[80] *Id*.

[81] See *Hall, supra* note 41, 572 U.S. at 710.

*Atkins* claim before 2018. In Lotter's direct appeal in 1998, we discussed the following expert testimony:

> Lotter has several mental disorders that have been ongoing since birth, that Lotter had those disorders at the time the crimes were committed, and that Lotter would continue to have those disorders. [A medical expert] described Lotter as "extremely dysfunctional" and stated that Lotter's mental disorders impaired his ability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.[82]

During Lotter's trial, the medical expert also testified there was a "high probability" that Lotter has "organic damage in the brain." The record also shows that in 1981, at the age of 10, Lotter received a full-scale IQ test score of 76. While such a score, even after being adjusted for the SEM, would still be above 70, and thus would not support the statutory presumption of intellectual disability under § 28-105.01(3), Lotter is simply wrong to suggest that an adjusted IQ score in the low 70s could not support a finding of intellectual disability in Nebraska.[83]

[18,19] The plain language of § 28-105.01(3) does not establish a strict cutoff IQ score of 70; rather, it creates an evidentiary presumption in favor of finding intellectual disability when the defendant has an IQ score of 70 or below on a reliably administered test. Moreover, unlike the Florida Supreme Court in *Hall*, this court has not construed § 28-105.01 in

---

[82] *Lotter, supra* note 3, 255 Neb. at 516, 586 N.W.2d at 632.

[83] See, e.g., *Atkins, supra* note 2, 536 U.S. at 309 n.5 (noting IQ between 70 and 75 "is typically considered the cutoff IQ score for the intellectual function prong of the [intellectual disability] definition"); *Vela, supra* note 66, 279 Neb. at 150, 777 N.W.2d at 307 (noting expert testimony that under clinical standard "'"it is possible to diagnose mental retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior"'").

a way that would prohibit those with an IQ score above 70 from presenting other evidence that would support a finding of intellectual disability.[84] Instead, as *Vela* recognized, Nebraska courts apply current clinical standards to the evidence in order to "reach [a] meaningful determination of whether a convicted defendant with an IQ in the low 70's is a person with mental retardation."[85]

Moreover, Lotter's 2018 diagnosis of intellectual disability was based on evidence provided to the expert regarding significant deficits in adaptive functioning that had existed throughout Lotter's childhood and young adult life. In other words, Lotter has been aware of the objective facts relative to his deficits in adaptive functioning since his childhood. Similar evidence of deficits in adaptive functioning was adduced during Lotter's trial more than 20 years ago. And we cannot ignore the fact that Lotter's current postconviction counsel, during the records hearing in this case, expressly advised the district court:

> I want to make this clear for the record. There actually was an effort to raise an intellectual disability claim after Atkins came down in this case. I don't know if [the State's counsel] is familiar with those proceedings, but it occurred in the context of the federal habeas proceedings. And there was a request to remand to the district court for — or to the state court for an Atkins determination. That ball was dropped. There were no evaluations done at that time and . . . counsel abandoned the effort.

As such, we agree with the district court that Lotter could have discovered, through the exercise of due diligence, the factual predicate to support a constitutional claim of intellectual

---

[84] See *Vela, supra* note 66.

[85] *Id*. at 150, 777 N.W.2d at 306.

disability under *Atkins* long before March 2018.[86] We therefore agree that Lotter's *Atkins* claim is not timely under § 29-3001(4)(b). And for the same reason, we also agree with the district court that Lotter's *Atkins* claim is procedurally barred, because he failed to raise it in his first postconviction motion after *Atkins* first announced the constitutional rule that those with an intellectual disability are ineligible for the death penalty.[87]

### (ii) Lotter's Claim Not Timely
### Under § 29-3001(4)(d)

Lotter argues that his *Atkins* claim is timely under § 29-3001(4)(d) because it was filed within 1 year after *Moore I* was decided, and he contends *Moore I* recognized a new constitutional rule which applies retroactively.

Under § 29-3001(4)(d), a postconviction claim is timely if filed within 1 year of the "date on which a constitutional

---

[86] See, e.g., *In re Jones*, 998 F.3d 187 (5th Cir. 2021) (holding defendant pointed to no factual predicate discovered in prior 1-year period that could not have been discovered earlier through exercise of due diligence to support intellectual disability claim); *In re Bowles*, 935 F.3d 1210, 1221 (11th Cir. 2019) (rejecting claim that factual predicate for claim of intellectual disability could not have been discovered previously through exercise of due diligence, reasoning, "[i]f, as he claims, he is an intellectually disabled person, then that factual predicate has existed for long enough that he could have brought his *Atkins* claims in his first habeas petition"); *State v. Jackson*, 2020 Ohio 4015, 157 N.E.3d 240 (2020) (finding successive postconviction claim based on *Atkins* was procedurally and time barred because defendant did not raise claim on direct appeal in 2002, in first postconviction motion in 2003, or in federal habeas action in 2007, and did not exercise due diligence in discovering facts to support intellectual disability before 2019).

[87] See *Lotter, supra* note 24, 278 Neb. at 477, 771 N.W.2d at 561 (postconviction claim of perjured testimony was procedurally barred because "Lotter fails to allege that this evidence was unavailable before any of the numerous challenges already made to his convictions and sentences"). See, also, *Jackson, supra* note 30; *Marshall, supra* note 30; *Ortiz, supra* note 30.

claim asserted was initially recognized by the Supreme Court of the United States or the Nebraska Supreme Court, if the newly recognized right has been made applicable retroactively to cases on postconviction collateral review." Lotter's argument that his *Atkins* claim was timely under § 29-3001(4)(d) requires us to determine whether *Moore I* recognized a new constitutional right which has been applied retroactively to cases on collateral review.

[20] As a general principle, the U.S. Supreme Court has said that state courts considering a matter on collateral review must give retroactive effect to new substantive rules of federal constitutional law.[88] Substantive rules of federal constitutional law include "'rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense.'"[89]

No one disputes that *Atkins* announced a new substantive rule of federal constitutional law when it held that the 8th and 14th Amendments to the U.S. Constitution categorically prohibit imposing the death penalty on the class of offenders who are intellectually disabled.[90] But neither the U.S. Supreme Court nor this court has previously considered whether *Moore I* announced a new substantive rule of constitutional law which must be applied retroactively to cases on collateral review.

---

[88] See *Montgomery v. Louisiana*, 577 U.S. 190, 200, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016) (holding that "when a new substantive rule of [federal] constitutional law controls the outcome of a case, the Constitution requires state collateral review courts to give retroactive effect to that rule"). See, also, *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989).

[89] *Montgomery, supra* note 88, 577 U.S. at 201, quoting *Penry, supra* note 42.

[90] *Penry, supra* note 42, 492 U.S. at 329 (noting "[i]f we were to hold that the Eighth Amendment [to the U.S. Constitution] prohibits the execution of mentally retarded persons . . . we would be announcing a 'new rule'").

Most state and federal courts to have considered the question have concluded that neither *Hall* nor *Moore I* announced new substantive rules of constitutional law which must be applied retroactively to cases on collateral review.[91] Indeed, one recent case described "a substantial and growing body of case law that has declined to apply *Hall* and *Moore* [*I*] retroactively."[92] Generally speaking, these courts have reasoned that *Hall* and *Moore I* merely adopted new procedures for ensuring states follow the constitutional rule announced in *Atkins*, and did not expand the class of individuals protected by *Atkins*' prohibition against the execution of individuals who are intellectually disabled.[93] For example, in *Phillips v. State*,[94] a case in which the U.S. Supreme Court denied a writ of certiorari, the Florida Supreme Court reasoned that while *Hall* "more precisely defined the procedure that is to be followed in certain cases to determine whether a person facing the death penalty is intellectually disabled," it did not expand the "categorical prohibition on executing the intellectually disabled," and was thus a mere application of the rule announced in

---

[91] See, e.g., *In re Richardson*, 802 Fed. Appx. 750 (4th Cir. 2020); *In re Payne*, 722 Fed. Appx. 534 (6th Cir. 2018); *Jackson, supra* note 86. See, also, *Weathers v. Davis*, 915 F.3d 1025 (5th Cir. 2019) (declining to apply *Moore I* retroactively); *Williams v. Kelley*, 858 F.3d 464 (8th Cir. 2017) (holding *Moore I* did not announce substantive rule of constitutional law that applied retroactively to successive habeas petition); *In re Henry*, 757 F.3d 1151 (11th Cir. 2014) (holding *Hall* did not announce new substantive constitutional rule that must be applied retroactively to cases on collateral review); *Phillips v. State*, 299 So. 3d 1013 (Fla. 2020), *cert. denied* ___ U.S. ___, 141 S. Ct. 2676, 210 L. Ed. 2d 837 (2021) (holding *Hall* did not apply retroactively on state collateral review). But see *White v. Commonwealth*, 563 S.W.3d 1 (Ky. 2018) (without discussing retroactive application of *Hall* or *Moore I*, applied both cases to conclude that Kentucky's definition of intellectual disability was unconstitutional and remanded postconviction case for evidentiary hearing on *Atkins* claim using prevailing medical standards).

[92] *Jackson, supra* note 86 (citing cases).

[93] See cases cited *supra* note 91.

[94] *Phillips, supra* note 91, 299 So. 3d at 1020.

*Atkins*. The Sixth[95] and Eighth Circuits[96] have adopted similar reasoning with respect to *Moore I*.

[21] We likewise hold that neither *Hall* nor *Moore I* announced a new substantive rule of constitutional law that must be applied retroactively to cases on collateral review. Instead, both *Hall* and *Moore I* applied the substantive constitutional rule initially announced in *Atkins* and then refined the appropriate standards states should apply to determine whether an offender is intellectually disabled. Because *Moore I* did not recognize a new constitutional right which has been applied retroactively to cases on collateral review, that case did not trigger the 1-year limitations period under § 29-3001(4)(d).

### (iii) Lotter's "Actual Innocence" Argument

Next, Lotter argues that Nebraska's rules governing procedural bars and time limitations in postconviction cases do not apply to his *Atkins* claim because, as someone who has been diagnosed as intellectually disabled, he is "actually innocent" of the death penalty. His argument rests on the U.S. Supreme Court opinion in *Sawyer*.[97] Before addressing Lotter's "actual innocence" argument under *Sawyer*, we provide an overview of the Supreme Court's jurisprudence in this area.

The Supreme Court's "actual innocence" jurisprudence developed in the context of claims for federal habeas corpus relief. In federal habeas cases, the general rule is that "claims forfeited under state law may support federal habeas relief only if the prisoner demonstrates cause for the default and prejudice from the asserted error."[98] But in 1986, the Court stated that "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ

---

[95] *In re Payne, supra* note 91.

[96] *Williams, supra* note 91.

[97] *Sawyer, supra* note 39.

[98] *House v. Bell*, 547 U.S. 518, 536, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006).

even in the absence of a showing of cause for the procedural default."[99] This is sometimes referred to as the "fundamental miscarriage of justice" exception, and it "is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons."[100] Over time, the Court has discussed at least three types of "actual innocence" claims, each with a different legal standard and purpose.[101]

In *Herrera v. Collins*,[102] the Court considered whether a habeas petitioner may assert a "freestanding" constitutional claim of actual innocence. In that case, the petitioner sought habeas relief alleging that newly discovered evidence showed he was "actually innocent" of the crime for which he stood convicted. The Court found that the "fundamental miscarriage of justice exception" did not apply, since that exception is only available when the prisoner uses a claim of actual innocence to excuse a procedural error relating to an independent constitutional claim.[103] But *Herrera* nevertheless assumed without deciding that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."[104] *Herrera* noted the threshold showing for such a freestanding claim "would necessarily be extraordinarily high."[105]

---

[99] *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986).

[100] *Herrera v. Collins*, 506 U.S. 390, 404, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993).

[101] See, generally, *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995); *Herrera, supra* note 100; *Sawyer, supra* note 39.

[102] *Herrera, supra* note 100, 506 U.S. at 401.

[103] *Id*., 506 U.S. at 404.

[104] *Id.*, 506 U.S. at 417.

[105] *Id.*

In *Schlup v. Delo*,[106] the Court discussed using a claim of actual innocence as a "gateway" to obtain review of a constitutional claim that is otherwise procedurally barred under state law. The Court explained that a *Schlup*-type actual innocence claim is "'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his [or her] otherwise barred constitutional claim considered on the merits.'"[107] Under *Schlup*, if the petitioner makes a "threshold showing" that he or she is actually innocent of the crime, the court may then consider whether the otherwise procedurally barred constitutional claim entitles the petitioner to federal habeas relief.[108]

In *Sawyer*, the Court described a third type of actual innocence claim—a claim that a habeas petitioner is "'actually innocent' of the death penalty."[109] A *Sawyer*-type actual innocence claim resembles the gateway actual innocence claim described in *Schlup*, as both are used to excuse a procedural default. But there is a critical difference: In a *Sawyer*-type claim, the petitioner alleges that the procedural default should be excused because he or she is actually innocent of the death penalty, rather than actually innocent of the crime itself.

The *Sawyer* Court acknowledged that the "prototypical example"[110] of an actual innocence claim involves "the case where the State has convicted the wrong person of the crime," and it recognized that "[i]t is more difficult to develop an analogous framework when dealing with a defendant who has been sentenced to death," since "[t]he phrase 'innocent of death' is not a natural usage of those words . . . ."[111] But it nevertheless found that such a claim was permissible in

---

[106] See *Schlup, supra* note 101, 513 U.S. at 315.

[107] *Id.*, quoting *Herrera, supra* note 100.

[108] *Schlup, supra* note 101, 513 U.S. at 317.

[109] *Sawyer, supra* note 39, 513 U.S. at 349.

[110] *Id.*, 513 U.S. at 340.

[111] *Id.*, 513 U.S. at 341.

federal habeas cases. And in crafting the framework for actual innocence claims in the death penalty sentencing context, *Sawyer* focused on whether the petitioner was *eligible* for the death penalty, rather than whether the petitioner was innocent of the crime itself. *Sawyer* held that to demonstrate actual innocence of the death penalty, a petitioner "must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law."[112] If such a showing is made, the federal habeas court can consider the merits of the constitutional claim, despite a state procedural bar.

Lotter correctly points out that Nebraska's postconviction jurisprudence has addressed the type of freestanding "actual innocence" claim described in *Herrera*.[113] And in 2016, we recognized that a *Herrera*-style claim of actual innocence "may be a sufficient allegation of a constitutional violation under the Nebraska Postconviction Act."[114] But even in cases where we have discussed a *Herrera*-type actual innocence claim, we have not once found a postconviction defendant to have satisfied the "extraordinarily high" showing necessary for an evidentiary hearing on such a claim.[115] Lotter himself has previously attempted to raise such an actual innocence claim, without success.[116]

---

[112] *Id.*, 513 U.S. at 336.

[113] See, e.g., *State v. Dubray*, 294 Neb. 937, 885 N.W.2d 540 (2016); *State v. Phelps*, 286 Neb. 89, 834 N.W.2d 786 (2013); *State v. Edwards*, 284 Neb. 382, 821 N.W.2d 680 (2012), *disapproved on other grounds, State v. Avina-Murillo*, 301 Neb. 185, 917 N.W.2d 865 (2018); *Lotter, supra* note 24; *State v. El-Tabech*, 259 Neb. 509, 610 N.W.2d 737 (2000) (Gerrard, J., concurring).

[114] *Dubray, supra* note 113, 294 Neb. at 947, 885 N.W.2d at 551.

[115] *Id.* at 948, 885 N.W.2d at 551.

[116] See *Lotter, supra* note 24, 278 Neb. at 482, 771 N.W.2d at 564 (declining to decide whether *Herrera*-type claim of actual innocence is cognizable under Nebraska Postconviction Act because evidence failed to "present an issue of Lotter's actual innocence").

But in this case, Lotter is not asserting a freestanding *Herrera*-type actual innocence claim. Instead, he argues that "as a person with an intellectual disability, he is actually innocent of the death penalty and thus his claim is not subject to procedural default or time bars."[117] In other words, Lotter is asking us to recognize a *Sawyer*-type claim of actual innocence and to allow him to proceed with his *Atkins* claim despite Nebraska's time and procedural bar rules.

In asking us to apply *Sawyer* to his postconviction motion, Lotter refers us to several federal cases in which habeas petitioners have raised a *Sawyer*-type actual innocence claim to argue they should be allowed to proceed on their procedurally barred *Atkins* claims because their intellectual disability rendered them ineligible for the death penalty under state law.[118] But as we explain, recognizing an actual innocence exception to Nebraska's procedural and time bar rules is a policy decision for the Legislature. Our opinion in *State v. Hessler*[119] is instructive.

In *Hessler*, a defendant seeking postconviction relief urged us to recognize an exception to Nebraska's procedural bar rules based on the U.S. Supreme Court's decision in *Martinez v. Ryan*.[120] *Martinez* held that a state procedural default will not bar a federal habeas court from considering a substantial claim of ineffective assistance of trial counsel if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.[121] We declined to adopt the *Martinez* rule as part of our postconviction jurisprudence, explaining:

> *Martinez* did not recognize a constitutional right to effective assistance of postconviction counsel. Based

---

[117] Reply brief for appellant at 7.

[118] E.g., *Prieto v. Zook*, 791 F.3d 465 (4th Cir. 2015); *Frazier v. Jenkins*, 770 F.3d 485 (6th Cir. 2014); *Sasser v. Norris*, 553 F.3d 1121 (8th Cir. 2009).

[119] *State v. Hessler*, 288 Neb. 670, 850 N.W.2d 777 (2014).

[120] *Martinez v. Ryan*, 566 U.S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012).

[121] *Id.*

upon principles of equity, it expanded only the types of cause permitting a federal habeas court to excuse a procedural default in a federal habeas proceeding. Nothing in *Martinez* prevents state courts from enforcing procedural defaults in accordance with state law.[122]

Emphasizing that the Nebraska Legislature has limited state postconviction relief to a single proceeding, and has expressly authorized courts to reject successive motions,[123] *Hessler* concluded that whether to allow successive postconviction motions based on the reasoning of *Martinez* was a matter of policy to "be addressed in the first instance to the Legislature."[124]

[22] We find our reasoning in *Hessler* instructive in responding to Lotter's request that we recognize a *Sawyer*-type actual innocence exception to Nebraska's procedural and time bars. While *Sawyer* recognized a path for a federal habeas court to excuse a procedural default, it did not recognize a new constitutional rule. And we see nothing in the language of *Sawyer*, or in any subsequent Supreme Court decision, which requires state courts to apply the reasoning of *Sawyer* to excuse procedural defaults in postconviction cases, nor do we see anything in *Sawyer* which would prevent a state court from enforcing its procedural or time bar rules when presented with an *Atkins* claim on collateral review. Indeed, state courts have held that a postconviction defendant can waive an *Atkins* claim by failing to follow the state's applicable procedural rules.[125] And the expectation that state courts will enforce their procedural bar rules is the reason the *Schlup* and *Sawyer* rules were developed in the first instance.

We decline Lotter's invitation to import a *Sawyer*-type actual innocence claim into our state postconviction jurisprudence. Lotter may be able to assert such a claim in a federal

---

[122] *Hessler, supra* note 119, 288 Neb. at 680, 850 N.W.2d at 786.

[123] See § 29-3001(3).

[124] *Hessler, supra* note 119, 288 Neb. at 681, 850 N.W.2d at 787.

[125] See, *State v. Frazier*, 115 Ohio St. 3d 139, 873 N.E.2d 1263 (2007); *Winston v. Com.*, 268 Va. 564, 604 S.E.2d 21 (2004).

habeas proceeding, but if a *Sawyer*-type actual innocence exception to Nebraska's procedural and time bars is to be recognized, it will be a policy decision made by the Legislature, not the courts. The district court did not err in rejecting Lotter's claim that he is actually innocent of the death penalty under *Sawyer*.

### (iv) § 28-105.01 Does Not Exempt
### Atkins Claims From Procedural
### and Time Bars in § 29-3001

Finally, Lotter argues that his *Atkins* claim is not subject to the procedural or time limitations in § 29-3001 "because the express language of . . . § 28-105.01(2) states that the death penalty *shall not* be imposed upon any person with an intellectual disability '*notwithstanding any other provision of law.*'"[126] In other words, Lotter contends that when a postconviction motion raises an *Atkins* claim, that claim is exempted from the procedural and time limitations in the Nebraska Postconviction Act by the statutory language in § 28-105.01(2). To the extent this argument has been preserved for appellate review, we find it to be without merit.

[23] It is difficult to discern, from the record on appeal, whether this argument was presented to and passed upon by the district court. Generally, when the timeliness of a postconviction motion is at issue, the defendant must raise all applicable arguments in the district court to preserve them for appellate review.[127] The face of Lotter's fifth postconviction motion does not assert that the language of § 28-105.01(2)

---

[126] Reply brief for appellant at 4 (emphasis in original).

[127] See *State v. Conn*, 300 Neb. 391, 914 N.W.2d 440 (2018). Accord *State v. Stelly*, 308 Neb. 636, 955 N.W.2d 729 (2021) (appellate court will not consider issue on appeal from denial of postconviction relief that was not raised in motion for postconviction relief or passed upon by postconviction court); *Munoz, supra* note 23 (appellate courts do not generally consider arguments and theories raised for first time on appeal; in appeal from denial of postconviction relief, appellate court will not consider for the first time on appeal issues not raised in verified motion).

exempts an *Atkins* claim from the procedural and time bars set
out in the Nebraska Postconviction Act. And we see no such
argument presented during the records hearing in February
2020. But the district court's order did briefly address, and
reject, some sort of statutory argument based on the language
of § 28-105.01(2), reasoning that the statute recognized only
a "statutory claim, not a constitutional claim" that would be
cognizable under the Nebraska Postconviction Act. Assuming
without deciding that the district court was rejecting the same
statutory argument Lotter now asserts on appeal, we reject
it too.

[24,25] To consider the meaning of § 28-105.01(2), we
apply familiar principles. When construing a statute, a court
must determine and give effect to the purpose and intent of
the Legislature as ascertained from the entire language of the
statute considered in its plain, ordinary, and popular sense.[128]
Additionally, the rules of statutory interpretation require an
appellate court to give effect to the entire language of a statute,
and to reconcile different provisions of the statutes so they are
consistent, harmonious, and sensible.[129] And in a previous case
where we considered the meaning of the statutory definition of
intellectual disability contained in § 28-105.01(3), we empha-
sized the importance of considering "the scope of the remedy
to which its terms apply and [giving] the statute such an inter-
pretation as appears best calculated to effectuate the design of
the legislative provisions."[130]

[26] The Legislature first enacted § 28-105.01(2) in 1998,[131]
several years before *Atkins* announced the constitutional rule
banning imposition of the death penalty on persons with
an intellectual disability. As such, § 28-105.01(2) was not

---

[128] *Moore v. Nebraska Acct. & Disclosure Comm.*, 310 Neb. 302, 965 N.W.2d
564 (2021).

[129] *Id.*

[130] *Vela, supra* note 66, 279 Neb. at 151, 777 N.W.2d at 307.

[131] See 1998 Neb. Laws, L.B. 1266, § 2.

enacted to codify the constitutional right recognized in *Atkins*. Rather, it was enacted to establish a statutory right in Nebraska prohibiting imposition of the death penalty on persons who are intellectually disabled. And to enforce that statutory right, the Legislature enacted a specific statutory procedure to allow a defendant facing the death penalty to file a verified motion and request a hearing to determine intellectual disability, before any sentencing determination is made.[132]

The 1998 statutory scheme also provided a procedure for those who had already been sentenced to death when the new statutory right was recognized:

> Within one hundred twenty days after the effective date of this act, a convicted person sentenced to the penalty of death prior to the effective date of this act may bring a verified motion in the district court which imposed such sentence requesting a ruling that the penalty of death be precluded under subsection (2) of this section and that the sentence be vacated.[133]

Lotter had been sentenced to death when this statute took effect, but he did not file a motion under this provision. In 2013, the Legislature removed this provision from § 28-105.01 altogether,[134] presumably because the 120-day window had long since expired. Currently, the only enforcement procedures available to defendants are those set out in § 28-105.01(4), and those procedures apply only to defendants who have not yet been sentenced to death. As such, Lotter's opportunity to request a hearing to enforce the statutory right not to have the death penalty imposed has long since passed.

Having waived his opportunity to pursue the statutory enforcement procedure previously available to him, Lotter

---

[132] *Id.*, codified at § 28-105.01(5) (Cum. Supp. 1998). See, also, § 28-105.01(4) (Cum. Supp. 2020).

[133] 1998 Neb. Laws, L.B. 1266, § 2, codified at § 28-105.01(4) (Cum. Supp. 1998).

[134] See 2002 Neb. Laws, L.B. 1, 3d Spec. Sess.

now asserts a constitutional claim of intellectual disability under *Atkins*, and he attempts to use language from § 28-105.01(2) to avoid the procedural and time bars under the Nebraska Postconviction Act. Specifically, Lotter argues that the phrase "notwithstanding any other provision of law" in § 28-105.01(2) should be construed as a Legislative "mandate[]"[135] that "renders moot"[136] the procedural and time limits which otherwise govern postconviction motions. We reject Lotter's proposed construction.

[27] As a general principle of statutory construction, courts have held that use of the phrase "notwithstanding any other provision of law" in a statute signals legislative intent to override other provisions of law that conflict with the statute.[137] We agree with this general principle,[138] but we see no conflict between the statutory rights and enforcement procedures set out in § 28-105.01 and the procedural and time limitations set out in the Nebraska Postconviction Act.

---

[135] Reply brief for appellant at 5.

[136] *Id.* at 6.

[137] See, e.g., *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18, 113 S. Ct. 1898, 123 L. Ed. 2d 572 (1993) (noting that "in construing statutes, the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section"); *Conyers v. Merit Systems Protection Bd.*, 388 F.3d 1380 (Fed. Cir. 2004) (holding phrase "notwithstanding any other provision of law" generally signals that specific statutory provision is to override more general conflicting statutory provisions that would otherwise apply to same subject); *Arias v. Superior Court*, 46 Cal. 4th 969, 983, 209 P.3d 923, 931, 95 Cal. Rptr. 3d 588, 598 (2009) (noting statutory phrase "notwithstanding any other provision of law" generally declares legislative intent to override "only those provisions of law that conflict with the act's provisions—not, as defendants contend, every provision of law").

[138] See *State ex rel. B.H. Media Group v. Frakes*, 305 Neb. 780, 798-99, 943 N.W.2d 231, 246 (2020) ("by using the phrase '[n]otwithstanding any other provision of law,' the Legislature demonstrated with clear intention that [the subject statute] should prevail *when it conflicts with another statute*") (emphasis supplied).

Lotter's argument conflates the statutory right recognized in § 28-105.01(2) with the constitutional right recognized in *Atkins*. But the statutory right is enforced presentence through the procedures set out in § 28-105.01(4), not through the Nebraska Postconviction Act, which exists only to remedy prejudicial constitutional violations that render a judgment void or voidable.[139]

Simply put, there is no conflict between the provisions of § 28-105.01(2) and the provisions of § 29-3001(4), because they address separate legal claims and provide separate legal remedies. The former applies to statutory claims of intellectual disability raised in a verified motion prior to the imposition of any sentence, and the latter applies to all constitutional claims raised in a verified postconviction motion by prisoners in custody seeking to vacate or set aside their sentence.

[28] We conclude the phrase "notwithstanding any other provision of law" in § 28-105.01(2) neither impacts nor overrides the procedural and time limitations applicable to postconviction motions under the Nebraska Postconviction Act. Lotter's argument to the contrary is meritless.

### (e) Conclusion on Lotter's *Atkins* Claim

For the foregoing reasons, we agree with the district court that Lotter's *Atkins* claim is both procedurally barred and time barred.

### 3. Lotter's L.B. 268 Claim

Lotter also argues he was entitled to an evidentiary hearing on his other postconviction claim, which asserted that the passage, and subsequent repeal by public referendum, of L.B. 268[140] had the effect of vacating, and then reinstating, his death sentences. The district court properly denied relief on this claim without an evidentiary hearing.

---

[139] See, § 29-3001(1); *Combs, supra* note 19.

[140] See 2015 Neb. Laws, L.B. 268.

We described the procedural history of L.B. 268 in *State v. Jenkins*:[141]

> In May 2015, the Nebraska Legislature passed 2015 Neb. Laws, L.B. 268,—which abolished the death penalty in Nebraska—and then overrode the Governor's veto of the bill. The Legislature adjourned sine die on May 29. Because L.B. 268 did not contain an emergency clause, it was to take effect on August 30.
>
> Following the passage of L.B. 268, opponents of the bill sponsored a referendum petition to repeal it. On August 26, 2015, the opponents filed with the Nebraska Secretary of State signatures of approximately 166,000 Nebraskans in support of the referendum. On October 16, the Secretary of State certified the validity of sufficient signatures. Enough signatures were verified to suspend the operation of L.B. 268 until the referendum was approved or rejected by the electors at the upcoming election. During the November 2016 election, the referendum passed and L.B. 268 was repealed, that is, in the language of the constitution, the act of the Legislature was "reject[ed]."

[29,30] All of Lotter's constitutional claims relating to L.B. 268 are premised on the theory that the legislation went into effect on August 30, 2015, and commuted his death sentences to life in prison, and that thereafter, the successful public referendum resulted in reimposition of his death sentences. But as the district court correctly recognized, we have rejected that theory as legally flawed in three prior cases—*Jenkins*,[142] *State v. Mata*,[143] and *State v. Torres*.[144] In *Jenkins*, we explained that L.B. 268 never actually went into effect,

---

[141] *Jenkins, supra* note 13, 303 Neb. at 706, 931 N.W.2d at 876-77. See, also, Neb. Const. art. III, § 3.

[142] *Jenkins, supra* note 13.

[143] *Mata, supra* note 13.

[144] *Torres, supra* note 13.

because "upon the filing of a referendum petition appearing to have a sufficient number of signatures, operation of the legislative act is suspended so long as the verification and certification process ultimately determines that the petition had the required number of valid signatures."[145] And we expressly held in *Jenkins*, *Mata*, and *Torres* that because L.B. 268 was suspended and never went into effect, any death sentences in effect at the time were unchanged.[146]

On appeal, Lotter acknowledges that our decisions in *Jenkins*, *Mata*, and *Torres* are "adverse[]"[147] to his central premise that L.B. 268 vacated his death sentences and the successful public referendum reinstated them. Lotter's appellate brief summarily states that all three cases "were wrongly decided and should be overruled,"[148] but he presents no argument in support, and we see no principled reason to revisit our settled jurisprudence on the issue.

Because all of Lotter's L.B. 268 claims are premised on the meritless theory that L.B. 268 vacated or changed his death sentences, the district court properly denied relief on these claims without conducting an evidentiary hearing.[149]

## V. CONCLUSION

Because Lotter's *Atkins* claim is both procedurally barred and time barred, and because his L.B. 268 claim is meritless, the district court did not err in denying Lotter's fifth successive motion for postconviction relief without conducting an evidentiary hearing. The judgments are affirmed.

Affirmed.

Freudenberg, J., not participating.

---

[145] *Jenkins, supra* note 13, 303 Neb. at 710, 931 N.W.2d at 879. See, also, *Torres, supra* note 13; *Mata, supra* note 13.

[146] *Id.*

[147] Brief for appellant at 27.

[148] *Id.*

[149] See, *Torres, supra* note 13; *Mata, supra* note 13; *Jenkins, supra* note 13.