IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. PRICE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JAMES S. PRICE, APPELLANT.

Filed May 30, 2023.    No. A-22-687.

Appeal from the District Court for Lancaster County: ANDREW R. JACOBSEN, Judge. Affirmed.

Mark E. Rappl, of Naylor & Rappl Law Office, for appellant.

Michael T. Hilgers, Attorney General, and Austin N. Relph for appellee.

RIEDMANN, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

James S. Price appeals from the order of the Lancaster County District Court denying his motion for postconviction relief without holding an evidentiary hearing. We affirm.

## II. BACKGROUND

### 1. CONVICTIONS AND DIRECT APPEAL

Price was charged with one count of aiding and abetting robbery and one count of aiding and abetting first degree assault as a result of events occurring on October 3, 2014. See *State v. Price*, 306 Neb. 38, 944 N.W.2d 279 (2020) (*Price I*). In December 2016, his first trial ended in a deadlocked jury and the court declared a mistrial. See *id.*

Following a second jury trial in June 2018, Price was convicted of both counts and sentenced to concurrent terms of 25 to 40 years' imprisonment. See *id.* On direct appeal, the

- 1 -

Nebraska Supreme Court affirmed Price's convictions and sentences. See *id.* The court set forth the evidence as follows:

Patrick Pantoja testified that at around 2:45 a.m. on October 3, 2014, he and a friend, Emmanuel Nartey, were walking north on 14th Street toward downtown Lincoln. As they passed by the Nebraska State Capitol Building, walking toward K Street, a group of three men approached and asked them if they had money. Pantoja said they did not, and he and Nartey continued walking north. Seconds later, Pantoja felt a hit to the back of his head; his memories after that became spotty, and his next clear memory was waking in a hospital room. Pantoja was able to describe the three men in general terms of race and clothing, but at trial, he did not identify Price or any other person as an assailant. Pantoja further testified regarding items of value that he had on his person immediately prior to the incident and that he did not have afterward.

Pantoja testified regarding the injuries he received and the effects of such injuries. The doctor who treated Pantoja also testified at trial and stated that when Pantoja arrived at the hospital, he was in a coma and required both a breathing tube and a feeding tube. Pantoja was diagnosed with severe traumatic brain injury; the doctor testified that such injury was consistent with being repeatedly punched and kicked in the head and that without medical intervention, his injuries could have been life threatening.

Nartey also testified, and he was able to provide more details regarding the incident. When the three men initially approached Nartey and Pantoja, one of the men told them to empty their pockets. Nartey and Pantoja ignored the men and continued walking; one of the men then hit Pantoja "from the back." At trial, Nartey described the three men as "[o]ne black guy and two white guys." He further described one of the "white guys" as having a "bald head" and wearing a "white shirt . . . with black markings on the shirt," and he testified that this man was the man who first hit Pantoja. Nartey testified that after the man first hit Pantoja, the second white man asked, "What are you guys doing?" and suggested they leave. The second white man either left or was otherwise not involved in what occurred after the first hit.

Pantoja fell to the ground after being hit the first time. When Nartey "went in to separate" the white man from Pantoja, "the black guy came on to [Nartey] to push [him] away." Pantoja had stood up, and so both the white man and the black man "went onto him to just hit him back to the ground . . . just punching him." When Nartey "went in again to separate them," the black man hit Nartey in the face and tried to empty Nartey's pocket. Nartey decided to run, and when he ran, both men stopped hitting Pantoja and chased after Nartey.

After Nartey got about a block away, he turned around and saw the two men had stopped chasing him. Nartey stopped and watched as the two men walked back toward Pantoja, who had stood up again; the two men knocked Pantoja to the ground again, and they "started kicking him in the face, in the head, anywhere", and Nartey "saw them empty [Pantoja's] pocket." "[A]fter hitting [Pantoja] for several times, [the two men] just left." After the two men left, Nartey ran to Pantoja and saw that "he had blood all over his face." Nartey also saw that Pantoja's "pocket was empty" and had apparently been searched. He also saw certain of Pantoja's belongings, including a wallet and credit cards, "scattered

around his body." Nartey looked for and found his cell phone, which he had dropped while running from the men. As he called for emergency assistance, an officer in a police car arrived.

The State asked Nartey at trial whether he saw "the white guy in court that [he] saw kicking and punching [Pantoja]," and Nartey identified Price. The State asked Nartey about his testimony that the "white guy . . . had a bald head." Nartey testified that Price had "very short hair at the time," but Nartey noted that at the time of the trial, Price's hair had grown and was "longer now than it was then."

On cross-examination, Price asked Nartey about his testimony in this case and his statements prior to trial describing the white man who hit Pantoja as being "bald" or having "no hair whatsoever." Price also cross-examined Nartey with a deposition in which Nartey described the man as wearing a "white shirt" but did not describe the shirt as having black lettering. Price also asked Nartey about being shown "six photographs of the white suspects" and whether he would agree that he was "unable to identify any one in that photo lineup . . . as being the white man who assaulted . . . Pantoja." The court sustained the State's hearsay objection before Nartey could answer.

Jerad McBride testified that he was the police officer who stopped upon seeing Pantoja on the ground with Nartey standing next to him, trying to wave McBride down. McBride observed that Pantoja was unconscious and "gasping for air" and had sustained injuries to his face and trauma to his head. McBride testified that Nartey described to him what had occurred when Nartey and Pantoja were approached by the three men. McBride asked Nartey for descriptions of the men; McBride testified that Nartey described the white man as having "a slim build with like a shaved head, short hair" and wearing "a white shirt." A patrol officer who had arrived on the scene drove around the nearby area looking for men matching the description given by Nartey but did not find anyone.

As part of their investigation of this case, McBride and other officers requested video surveillance from security employees at the Nebraska State Capitol, who provided video that they thought might be relevant. McBride watched one surveillance video that was taken at around 2:44 a.m. on October 3, 2014, and depicted a portion of the Governor's residence located near the Capitol building. McBride was attempting to determine whether persons depicted in the video matched the descriptions given of the suspects in this case. McBride asked another officer, Andrew Vocasek, to watch the video because he had been in the area on the night of the incident.

Vocasek testified at trial that in the early hours of October 3, 2014, he was working foot patrol in the area of 14th and O Streets in downtown Lincoln. Vocasek remembered talking to Price "sometime before 2 a.m." on October 3. Vocasek knew Price from "see[ing] him around" and "chatting" with him on several prior occasions. Vocasek testified that he had a "casual conversation" with Price and that Price "was with another gentleman" at the time. Vocasek testified that when he watched the surveillance video, he recognized one of the persons depicted in the video, and that the appearance of the person was consistent with how Price looked when Vocasek had seen him earlier.

Price thereafter became a suspect in the investigation, and police obtained a warrant to search the apartment in which Price lived with two other men, one of whom was Stelson

Curry, who is a black male. In a search conducted on October 30, 2014, police found, inter alia, several items of clothing that matched the clothing worn by the two persons shown in the surveillance video. Certain of the pieces of clothing were found in a room that was identified as being Price's bedroom. An officer interviewed Price at the police station while the search warrant was being executed. Price denied taking part in the assault and initially stated that he likely had not left his apartment that night. After being shown still photographs from the surveillance video recorded around the time and location of the assault, Price stated that he may have gone out to one of two locations that night, but neither location was near where the surveillance camera was located.

Another investigator testified that she listened to the recording of a call that Curry placed to Price from jail on October 31, 2014, the day after the search. The call occurred after the interview of Price described above and at a time when Price had been released but Curry was in jail. In the conversation, Price listed for Curry the items that had been seized in the search of the apartment. In this call, Price identified some of the items of clothing as belonging to Curry and some as belonging to himself.

Police later submitted items found in the search for forensic testing. The testing showed that Pantoja's blood was on a pair of shoes that had been identified as belonging to Curry. Thereafter, in February 2015, Curry was arrested in this case.

Price was again interviewed by a police officer in April 2015. Price still denied being involved in the assault; he no longer stated that he might have gone to one of the two locations he mentioned in the earlier interview, and instead, he said that he might have walked around with Curry smoking a marijuana cigarette. Price was arrested in this case in July 2015.

At the close of the State's case, Price moved for a directed verdict and the court overruled the motion. Price chose not to testify, and he presented no other evidence in his defense. After resting his defense, Price renewed his motion for a directed verdict and the court again overruled the motion.

Price's counsel made no objections during the State's closing argument. The jury thereafter returned verdicts finding Price guilty on both counts. Prior to sentencing, at Price's request, the court discharged his counsel and appointed new counsel to represent Price. The court overruled Price's motion for new trial. The court thereafter sentenced Price to concurrent terms of imprisonment for 25 to 40 years on the two convictions.

*Price I*, 306 Neb. at 45-49, 944 N.W.2d at 287-90 (brackets and ellipses in original).

We note that unlike the first trial where Curry testified that Price was involved in the assault of Pantoja, and also identified himself and Price in the surveillance video by the Governor's residence, Curry was not called to testify in the second trial. Additionally, at both trials, there was evidence indicating that Price and Curry shared an apartment with another individual near 17th and G Streets, which was within a couple blocks of the Governor's residence.

With the assistance of his newly appointed counsel, Price filed a direct appeal arguing, in part, that during the second trial, (1) the State committed prosecutorial misconduct by making improper statements during closing argument, (2) the court abused its discretion when it denied

his motion for a new trial, (3) there was not sufficient evidence to support his convictions, (4) the court imposed excessive sentences, and (5) counsel was ineffective.

The Nebraska Supreme Court found that the prosecutor's statements during closing arguments were not improper, the trial court did not abuse its discretion when it overruled Price's motion for new trial, there was sufficient evidence to support Price's convictions, and the sentences imposed were not excessive. The court did not consider Price's claim of ineffective assistance of counsel because it found Price's assignment of error did not specify how counsel's performance was alleged to be deficient. As noted previously, the court affirmed Price's convictions and sentences. The mandate in *Price I* was issued on June 19, 2020.

### 2. POSTCONVICTION

On May 28, 2021, Price, pro se, timely filed a verified motion for postconviction relief. See Neb. Rev. Stat. § 29-3001(4) (Reissue 2016) (1-year limitation to file verified motion for postconviction relief). Price alleged that his appellate counsel was ineffective for failing to properly assign as error on direct appeal that trial counsel was ineffective for (1) failing to properly impeach Nartey regarding (a) the physical description of the white male assailant, specifically the assailant's hair style, height, clothing, and other descriptive features, (b) his inability to identify Price as the white male depicted on the Governor's Mansion surveillance camera, (c) details of the assault, and (d) the direction the other white male traveled after the assault and robbery; (2) failing to properly impeach Officer Vocasek about when he observed Price downtown the night of the assault; (3) failing to properly investigate, obtain, and present favorable evidence about the white male "who was actually responsible for the assault and robbery"; (4) failing to object to prosecutorial misconduct; (5) failing to argue Nartey's inability to identify Price in a pretrial photo lineup was admissible as a non-hearsay prior inconsistent statement; (6) failing to object to improper 404 impeachment evidence; (7) failing to properly communicate with Price prior to the second jury trial; and (8) failing to properly argue the motion for new trial. Price further alleged that his appellate counsel was ineffective for failing to assign on direct appeal that the trial court erred by (9) preventing trial counsel from confronting Nartey with his inability to identify Price as the white male assailant during a pretrial photo lineup; and (10) allowing improper 404 evidence to be introduced at trial. Finally, Price alleged that (11) he was denied due process because of prosecutorial misconduct.

The State filed a response and motion to deny postconviction relief without an evidentiary hearing. The State alleged that all of Price's claims were either insufficiently pled, refuted by the record, or Price could not show prejudice, and therefore he was not entitled to an evidentiary hearing.

Counsel entered an appearance for Price. Price's postconviction counsel was different than his counsel at trial and on direct appeal.

On October 28, 2021, a hearing was held on Price's motion for postconviction relief and the State's response and motion for such relief to be denied without an evidentiary hearing. On September 13, 2022, the district court entered an order overruling Price's motion for postconviction relief without an evidentiary hearing. The court addressed Price's claims, and it

- 5 -

determined that they were insufficiently pled, refuted by the record, or Price could not show prejudice.

Price appeals.

## III. ASSIGNMENTS OF ERROR

Price assigns that the district court erred by denying his claims of ineffective assistance of counsel and prosecutorial misconduct without conducting an evidentiary hearing.

## IV. STANDARD OF REVIEW

When a district court denies postconviction relief without conducting an evidentiary hearing, an appellate court determines de novo whether the petitioner has alleged facts that would support the claim and, if so, whether the files and records affirmatively show that he or she is entitled to no relief. *State v. Jennings*, 312 Neb. 1020, 982 N.W.2d 216 (2022).

Whether a claim raised in a postconviction proceeding is procedurally barred is a question of law. *State v. Lessley*, 312 Neb. 316, 978 N.W.2d 620 (2022). When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Id.*

## V. ANALYSIS

### 1. GENERAL PRINCIPLES OF LAW

Postconviction relief is available to a prisoner in custody under sentence who seeks to be released on the ground that there was a denial or infringement of his or her constitutional rights such that the judgment was void or voidable. *Id.* Thus, in a motion for postconviction relief, the defendant must allege facts which, if proved, constitute a denial or violation of his or her rights under the U.S. or Nebraska Constitution, causing the judgment against the defendant to be void or voidable. *State v. Lessley, supra*. The district court must grant an evidentiary hearing to resolve the claims in a postconviction motion when the motion contains factual allegations which, if proved, constitute an infringement of the defendant's rights under the state or federal Constitution. *Id.*

However, the allegations in a motion for postconviction relief must be sufficiently specific for the district court to make a preliminary determination as to whether an evidentiary hearing is justified. *Id.* An evidentiary hearing is not required on a motion for postconviction relief when (1) the motion does not contain factual allegations which, if proved, constitute an infringement of the movant's constitutional rights rendering the judgment void or voidable; (2) the motion alleges only conclusions of fact or law without supporting facts; or (3) the records and files affirmatively show that the defendant is entitled to no relief. *Id.*

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Lessley, supra*. To show that counsel's performance was deficient, the defendant must show counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice under the prejudice component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *State v.*

- 6 -

*Lessley, supra*. A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome. *Id.* The likelihood of a different result must be substantial, not just conceivable. *Id.* The two prongs of this test may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable. *Id.*

When a claim of ineffective assistance of appellate counsel is based on the failure to raise a claim on appeal of ineffective assistance of trial counsel (a layered claim of ineffective assistance of counsel), an appellate court will look at whether trial counsel was ineffective under the *Strickland* test. *State v. Cullen*, 311 Neb. 383, 972 N.W.2d 391 (2022). If trial counsel was not ineffective, then the defendant was not prejudiced by appellate counsel's failure to raise the issue. *Id.* Much like claims of ineffective assistance of trial counsel, the defendant must show that but for appellate counsel's failure to raise the claim, there is a reasonable probability that the outcome would have been different. *Id.*

## 2. INEFFECTIVE ASSISTANCE OF COUNSEL

Price assigns that the district court erred by denying his claims of ineffective assistance of counsel without conducting an evidentiary hearing.

Price was represented on direct appeal by counsel different from his trial counsel. Price contends that his appellate counsel was ineffective on direct appeal by failing to preserve and raise multiple claims of ineffective assistance of trial counsel. Price "is alleging three claims of ineffective assistance of appellate counsel and eight claims of ineffective assistance of trial counsel that were denied by the District Court without an evidentiary hearing"; "For each of these claims, Appellate counsel either failed to preserve them on direct appeal (in violation of *State v. Mrza*[, 302 Neb. 931, 926 N.W.2d 79 (2019)]) or failed to raise them at all." Brief for appellant at 11. We address each of Price's claims in turn.

### (a) Impeachment of Nartey

#### (i) Details of Assault

Price alleged that his appellate counsel was ineffective for failing to properly assign as error on direct appeal that trial counsel was ineffective for failing to properly impeach Nartey regarding details of the assault.

During the second jury trial in June 2018, Nartey testified that he and Pantoja encountered "one black guy, two white guys." After "the black guy said to empty our pockets," "we ignored them, and kept walking." "So when we're just about to cross the street, the white guy just hit [Pantoja] from behind and [Pantoja] fell to the ground" and the white assailant continued hitting Pantoja while he was on the ground. Nartey said he

> went in to separate the two. Then the black guy came on to me to push me away and both the black guy and the white guy went on [Pantoja] so I went in again to separate them. That was when the black guy came at me, hit me in the face and tried to empty my pocket.

Nartey decided to run, and the two assailants started chasing him down the street. After the two men stopped chasing Nartey, they went back to Pantoja and further assaulted him before emptying

his pockets and leaving the scene. Nartey said the other white male was not involved in the incident; the last time Nartey saw the other white male was "when the white [assailant] hit [Pantoja] from behind and we started that phase of the altercation."

Price claims that his trial counsel "ineffectively neglected to confront Nartey with a number of prior inconsistent statements regarding the details surrounding the assault." Brief for appellant at 33. Price points to Nartey's testimony during two depositions and the first jury trial.

During a July 2015 deposition, Nartey said that after the black male told him and Pantoja to empty their pockets, they started walking away and then the "white guy jump [sic] onto [Pantoja]." Price argues that Nartey's deposition testimony that the white male "jump[ed]" on Pantoja was inconsistent with his testimony at the second trial that the white male "hit" Pantoja.

During a May 2016 deposition, Nartey said that after the black male told him and Pantoja to empty their pockets, they started walking away and then the "black guy just jump [sic] on [Pantoja] from behind." (Earlier Nartey said Pantoja was rushed and hit from the back.) Price argues that Nartey's deposition testimony that the "black" male jumped on Pantoja was inconsistent with his testimony at the second trial that it was the "white" male.

Also, during the May 2016 deposition, Nartey said that when he tried to separate the black male and Pantoja, the white male pushed Nartey off. Price argues that Nartey's deposition testimony that the "white" male pushed him off was inconsistent with his trial testimony that the "black" male pushed him.

During the first jury trial in December 2016, Nartey testified that after the black male told them to empty their pockets, "the black guy jumped onto [Pantoja] from behind," and "one of the white guys . . . went onto [Pantoja] so there was then the white guy and the black guy both fighting [Pantoja] and I went in to separate the fight." On cross-examination, Nartey confirmed that both the black male and white male attacked Pantoja essentially at the same time. Price argues that Nartey's testimony during the first trial that the "black" male jumped on Pantoja was inconsistent with his testimony during the second trial that the "white" male initially attacked Pantoja. Price further argues that Nartey's testimony during the first trial that he tried to separate both the black male and white male from Pantoja was inconsistent with his testimony during the second trial that he tried to separate the "white" male from Pantoja.

Even if trial counsel was deficient for failing to more thoroughly impeach Nartey regarding inconsistent statements about the details of the assault and robbery, Price cannot show prejudice. Nartey never wavered in the fact that he and Pantoja encountered three men (one black and two white), and that only the black male and one of the white males participated in the assault and robbery. Whether Pantoja was initially "hit" or "jumped" from behind makes no difference, even assuming the two descriptive words were inconsistent. Additionally, whether it was the black male or the white male that initially attacked Pantoja, and which of the two assailants pushed Nartey, does not change the fact that it was those two men who participated in the attack; the other white male was not involved by all accounts. Because Price has not shown a reasonable probability that the previous inconsistent statements about the details of the attack would have undermined confidence in the outcome of trial, he cannot show prejudice and this claim of ineffective assistance of counsel fails.

Price alleged that his appellate counsel was ineffective for failing to properly assign as error on direct appeal that trial counsel was ineffective for failing to properly impeach Nartey regarding the direction the other white male traveled after the assault and robbery.

During the second jury trial, Nartey testified that the last time he saw the other white male was "when the white [assailant] hit [Pantoja] from behind and we started that phase of the altercation." Price argues "Nartey's trial testimony implied that the innocent white male did not leave the scene of the crime with the black male and white male assailants following the assault and robbery." Brief for appellant at 26. "In other words, Nartey's testimony during the second jury trial eliminated the possibility that the Governor Mansion's surveillance cameras captured the innocent male which meant that, if the jury believed that [Price] was captured on the surveillance cameras (as vehemently argued by the State) then [Price] had to have been the white male assailant rather than the innocent white male." *Id.* Price points to three prior inconsistent statements by Nartey.

At the scene of the incident in October 2014, Nartey indicated to Officer McBride in a recorded statement that all three men went south on 14th Street after the assault and robbery. During a deposition in July 2015, when asked if all three men ran off together, Nartey said "[t]hey walked" together. During a deposition in May 2016, Nartey was asked what direction the men traveled when they left Pantoja, and Nartey replied, "They went south on 14th Street." When asked, "All three of them?" Nartey replied, "I just saw the two, yeah, so they met the third one. They left. All three just went that way." During another question, Nartey confirmed that all three men were still together as they left the scene.

Price argues that had trial counsel properly impeached Nartey with his inconsistent statements, "it would have established that the innocent white male left the scene of the crime at the same time as the other two male assailants, heading in the precise direction of the Governor's Mansion's surveillance cameras, which provided an opportunity for the innocent white male to be captured on the surveillance video." Brief for appellant at 27.

Even if trial counsel was deficient for failing to impeach Nartey regarding inconsistent statements about the direction the other white male traveled, Price cannot show prejudice. As noted by the State, "the failure to impeach this testimony did not eliminate the possibility that the innocent white male was the one on the surveillance video." Brief for appellee at 16. Rather, it was other evidence that indicated Price was captured in the surveillance video.

The surveillance video at issue, although somewhat grainy, shows two men, one appearing to be black and the other appearing to be lighter skinned; the lighter skinned male had very short hair and was wearing a light-colored shirt with dark markings. As will be discussed later, during direct examination, Nartey testified that the white male assailant had a "bald head," "very short hair," and was wearing a white shirt with black markings. This description matches one of the two people in the surveillance video. Nartey acknowledged that he could not identify the two people in the surveillance video. Officer Vocasek, however, testified that he recognized one of the people in the surveillance video, and that the appearance of the person was consistent with how Price looked when Vocasek saw him earlier that night, prior to the incident. Additionally, Pantoja testified prior to Nartey, and Pantoja described the three men as follows: "One, I believe, was

African-American. . . . One of them, I believe, was white or Hispanic, light skinned. The other one, I believe, had somewhat medium to long hair because his hair was poking out through the hood of his hoodie." Notably, neither the black male nor the lighter skinned male in the surveillance video had medium to long hair. Finally, Nartey identified Price in court as the white male assailant. Because Price has not shown a reasonable probability that the previous inconsistent statements about direction of travel would have undermined confidence in the outcome of trial, he cannot show prejudice and this claim of ineffective assistance of counsel fails.

### (iii) Physical Description of White Assailant

Price alleged that his appellate counsel was ineffective for failing to properly assign as error on direct appeal that trial counsel was ineffective for failing to properly impeach Nartey regarding the physical description of the white male assailant, specifically the assailant's hair style, height, and clothing. Nartey "was the only eyewitness who was able to provide a description of the white male who participated in the robbery and assault of Patrick Pantoja." Brief for appellant at 12. "The State's case rested solely on whether the jury believed that Nartey's identification of [Price] as the perpetrator was reliable and credible." *Id.* Because Nartey's identification of Price "was the linchpin of the State's case, it was of the utmost importance that trial counsel properly and aggressively impeach Nartey with his numerous prior inconsistent statements regarding the physical description of the white assailant." *Id.* at 14-15.

### a. Hair Style

During the second jury trial in June 2018, Nartey testified on direct examination that the white male assailant had a "bald head," "very short hair at the time."

When asked about his own hairstyle on direct examination, Nartey said that he had "short" hair on the day of the incident. When asked if he considered it "shaved, bald, or something else," Nartey replied, "Shaved." When asked to describe his own head in court that day, Nartey replied, "Bald."

On cross-examination, Nartey confirmed that he would currently describe himself as bald. Nartey was then asked, "And when the original officer on the scene contacted you and took a statement from you and asked you for a description of the white man who was involved in the assault, you described that white man as bald," Nartey replied, "Correct." Nartey was again asked, "And when you were talking to the officer at the scene you indicated that the white suspect didn't have any hair," Nartey replied, "Correct." And when asked if he "indicated to the officer that the white suspect had no hair whatsoever," Nartey replied, "Yes. He had a bald head."

On redirect, Nartey stated that when he gave an initial statement to the officer who arrived on the scene, he was in a state of shock. He gave a more relaxed interview with the officer 20 to 30 minutes later. Nartey had depositions taken in July 2015 and May 2016, and he testified at the first trial in December 2016. When asked, "From your recollection, have you given a consistent description of the white male that you've identified today as James Price," Nartey responded, "I have to the best of my recollection." He said, "College age, white male, same, with no hair." And when asked if, when the incident happened, he was paying attention to people's hair styles, Nartey replied, "No." During the incident he was "very much focused on [Pantoja]."

Price argues, "Trial counsel failed to confront Nartey properly and effectively with the fact, that despite stating multiple times that the white assailant was completely bald, both during direct examination and in prior statements, he all of a sudden changed his testimony on direct examination and stated, 'He had a [sic] very short hair at the time.'" Brief for appellant at 17. "Never before had Nartey stated that the assailant had any other hairstyle than completely bald." *Id*. And "trial counsel should have aggressively questioned Nartey regarding the *three* prior statements he had made under oath unequivocally stating the white male assailant was completely bald or had no hair"; "had trial counsel done so, the jury would have had a significantly different perception of Nartey's credibility." *Id*. at 17-18 (emphasis in original).

Even if trial counsel was deficient, Nartey cannot show prejudice on this claim. As noted by the State, "Price's trial counsel confronted Nartey on this issue and got him to reaffirm that the white assailant was bald, meaning that he had 'no hair whatsoever,'" and "on redirect examination, Nartey again testified that the white assailant was a white male 'with no hair.'" Brief for appellee at 14. Thus, Nartey's inconsistent statements were brought to light during questioning. Additionally, Price's trial counsel noted the inconsistencies during closing arguments.

It is true that in his July 2015 and May 2016 depositions, as well as at the first jury trial in December 2016, Nartey described the white male assailant as either "all bald," "completely bald" with "no hair," or "bald, like, no hair at the time." However, Officer McBride testified regarding statements Nartey made at the scene. Officer McBride said Nartey "seemed shaken" and initially described the white male involved as having "a shaved head, short hair." Once Pantoja was loaded into the ambulance, Officer McBride spoke to Nartey a little bit more. At that time, Nartey described the white male as having no hair. When Officer McBride replied, "no hair, like, short, shaved hair?" Nartey replied it was shaved. (We note that this was consistent with Officer McBride's testimony at the first jury trial wherein he testified that at the scene Nartey described the white male assailant as having "short, buzzed hair.") Thus, contrary to Price's assertion, Nartey had previously stated that the white assailant had a hairstyle other than completely bald; and that statement was made at the scene of the incident, not at depositions or trials that took place months or years later.

Nartey's initial description during the second jury trial of the white assailant's hairstyle correlated to the description he gave to the officer at the scene. Nartey's later inconsistent descriptions were brought to light at the second trial. Accordingly, Price cannot show prejudice regarding inconsistencies about the white assailant's hairstyle and thus his ineffective assistance of counsel claim on that issue fails.

### b. Height

During the second jury trial in June 2018, Nartey said he was 5 feet 9 inches tall. He described the white male assailant as "a bit taller than me."

Price claims that "this statement is a significant departure from Nartey's prior statements regarding the white male assailant's height." Brief for appellant at 19. Price notes that during a May 2016 deposition, Nartey said the white male assailant was "*about my height* or a little bit shorter." (Emphasis supplied.) And during the first jury trial in December 2016, Nartey testified that the white male assailant was "about" 5 feet 8 inches tall. Price argues that had trial counsel confronted Nartey about the inconsistencies, "the jury would have had a significantly different

perception of Nartey's credibility and ability to accurately identify [Price] as the white assailant." Brief for appellant at 19.

As noted by the district court, "although Nartey differed about whether [the white assailant] was taller or shorter, Nartey was consistent in describing that the attacker was about [Nartey's] height." The district court found, "Nartey's inability to precisely recall the height of the assailant would not have altered the evidentiary picture presented at trial," and "[t]here is no reasonable probability that the jury would have decided [Price] was not the assailant if his counsel had attempted to impeach Nartey on his descriptions of the assailant's height." We agree. Because Price cannot show prejudice regarding the assailant's height, his ineffective assistance of counsel claim on this issue fails.

### c. Clothing

During the second jury trial, Nartey testified on direct examination that the white male assailant was wearing a "white shirt . . . with black markings on the shirt." On cross-examination, the following exchange took place between defense counsel and Nartey.

Q. And the statement that was given, and I think you said that here today and it's been your contention all along, that the white suspect wore a white T-shirt.

A. Yes.

Q. Now, today in court you indicated that this white T-shirt had black lettering on it.

A. Yes.

Q. Other than in court here today, have you ever told anyone that detail?

A. No.

Q. And you have made a statement about the description of the suspect, and I'm referring to the white suspect. You have been asked many times what clothing he was wearing.

A. Yes.

Q. The police have asked you more than once --

A. Correct.

Q. -- true? And I personally have asked you more than once.

A. Yes.

Q. And you've testified in a deposition and in a previous court hearing under oath and at no time, did you ever say there was any black lettering on the front of the T-shirt, is that correct?

A. I believe so.

Q. You believe that that's correct, that you've never said anything about any black lettering?

A. I'm not sure if I did before or not.

Q. Well, when do you think you might have because I can show you your previous testimony, sir, so you tell me when do you think you've ever told anyone that there was black lettering on the front of the shirt?

A. Maybe I didn't.

Q. Okay. Would you like to see your testimony, sir, because I can show it to you?

- 12 -

A. No, I'm good.

Q. Okay. So I just want to make sure we're clear, sir. Will you concede that until today you have never told anyone about black lettering on the front of the white T-shirt, would you agree with that?

A. I'm not sure if today is my first time stating that.

Nartey was then asked about his May 2016 deposition, and he agreed with counsel that at that deposition he said it was a white T-shirt and that he never mentioned anything about black lettering.

On redirect, the prosecutor asked Nartey if he was "ever asked whether the shirt had markings on it of any sort?" Nartey replied, "I don't remember." Nartey was also asked, "So as you sit here today, do you have an independent memory of there being black lettering on the white male's shirt?" Nartey responded, "Yeah, I remember there was some marks on the white shirt." He denied that anyone had shown him shirts or pictures of shirts before his testimony that day.

During closing arguments, Price's trial counsel reiterated that Nartey had never mentioned the black lettering on the T-shirt before that jury trial; not when speaking to the police officer, not in either of the two depositions, and not at a separate hearing.

Price argues that "Nartey's testimony regarding the existence of the black markings on the white male assailant's shirt was of critical importance to the State's case because the white male captured on the Governor's Mansion's surveillance cameras was wearing a light-colored shirt with black lettering on it." Brief for appellant at 20. "Additionally, the brand-new description provided by Nartey matched clothing that was subsequently located by law enforcement following a search of [Price's] apartment." *Id.* Price further argues, "Although trial counsel did confront Nartey with the fact that he had never previously mentioned the black lettering prior to his testimony during the second jury trial, trial counsel neglected to effectively confront Nartey with the requisite detail and precision which was required in order to properly impeach Nartey's credibility in front of the jury." *Id.* at 22. Price claims that trial counsel failed to get Nartey to "unequivocally admit that he never previously mentioned the black lettering." *Id.*

Price cannot show prejudice regarding the lettering on the T-shirt because it was established that Nartey mentioned the lettering for the first time during the second jury trial. And while trial counsel's cross-examination referenced only one previous deposition, the fact that Nartey was testifying to the lettering for the first time at the second trial confirms that he had not disclosed that fact in any previous statement or testimony. Because Price cannot show prejudice regarding the lettering on the T-shirt, this claim of ineffective assistance of counsel fails.

(b) Inability to Identify Price on Surveillance Video

Price alleged that his appellate counsel was ineffective for failing to properly assign as error on direct appeal that trial counsel was ineffective for failing to confront Nartey regarding his inability to identify Price as the white male depicted on the Governor's Mansion surveillance video.

During the second jury trial, Nartey was shown video from surveillance footage and asked if he recognized the people in that video; he said "No." He was later asked if anybody had shown him that video before today, and he replied, "No." When asked if this was the first time since

October 3, 2014, that he had seen this video, Nartey replied, "Yes." And when asked if anybody had told him about what was shown in the video, Nartey replied, "No."

Because Nartey testified that he could not identify anyone in the surveillance video, that information was already before the jury. Price cannot show a reasonable probability that trial counsel's failure to further confront Nartey about that fact was sufficient to undermine confidence in the outcome of trial. Because Price cannot show prejudice, this claim of ineffective assistance of counsel fails.

(c) Inability to Identify Price in Photo Lineup

Price alleged that his appellate counsel was ineffective for failing to properly assign as error on direct appeal that trial counsel was ineffective for failing to confront Nartey about his inability to identify Price in a pretrial photo lineup.

During the second jury trial, Nartey was asked on cross-examination about a photo lineup of possible suspects that he was shown in October 2014, the month of the assault. Price asked Nartey about being shown "six photographs of the white suspects" and whether he would agree that he was "unable to identify any one in that photo lineup . . . as being the white man who assaulted . . . Pantoja." At that point, the State made a hearsay objection, which the district court sustained. Defense counsel and the prosecutor then approached the bench, and the following discussion occurred in "low tones at the bench."

> [Defense counsel]: Your Honor, I'm allowed to impeach him if -- I believe I'm allowed to impeach him by showing that he was unable to identify the defendant in the past.
>
> [Prosecutor]: It's improper impeachment. An out-of-court identification is considered hearsay. I think that it is possible for a witness to be impeached by their performance on a lineup, but there are certain steps that need to be taken. It is not impeachment unless you know who was in the lineup, what characteristics the photographs had, what characteristics the defendant had, what were the circumstances surrounding the lineup, the date is important, too. We're just speaking generally about white people in a lineup.
>
> . . . .
>
> THE COURT: At this point, the objection is sustained.
>
> [Defense counsel]: I'm going to object to him being released from the subpoena.
>
> THE COURT: That's fine.

Later, Investigator Jennifer Glantz testified that a photo lineup of possible suspects was prepared, and she explained how it was prepared; a photo of Price was included in the lineup. Investigator Glantz showed that photo lineup to Nartey on October 11, 2014, but Nartey was not able to identify Price as a suspect. Defense counsel never recalled Nartey to question him about the photo lineup.

Price argues that "trial counsel inexplicably failed to recall Nartey as a witness in an attempt to impeach him regarding his inability to identify [Price] in a pretrial photo lineup." Brief for appellant at 31. Even assuming that trial counsel was deficient for failing to recall Nartey, Price cannot show prejudice because Nartey's inability to identify Price in the photo lineup came in

through the testimony of Investigator Glantz. Although Price argues that Investigator Glantz' testimony "is a poor substitution for an actual direct confrontation of the State's 'star' witness, Nartey," *id.* at 32, he has not shown a reasonable probability that trial counsel's failure to recall Nartey was sufficient to undermine confidence in the outcome of trial. Because Price cannot show prejudice, this claim of ineffective assistance of counsel fails.

### (d) Failure to Investigate Other White Male

Price alleged that his appellate counsel was ineffective for failing to properly assign as error on direct appeal that trial counsel was ineffective for failing to "investigate, obtain, and present evidence regarding the identity of the white male who was actually responsible for the assault and robbery." Brief for appellant at 36. He argues that "[s]ince one of the white males was innocent and one of them was guilty, it was important for the jury to know the name and identity of both white males." *Id.* Price contends that trial counsel had "some information" regarding the identity of the white male assailant, and specifically points to a recorded jail phone call between Price and Curry on October 31, 2014, wherein Curry mentioned the "Little White Boy." *Id.* Although portions of the jail call came in at trial through the testimony of Investigator Glantz, "neither the State nor trial counsel . . . introduced any evidence from this recorded jail call pertaining to . . . Curry's mention of the 'Little White Boy.'" *Id.* Because the evidence at trial clearly established that two white males and one black male (Curry) were present at the time of the robbery and assault, "[t]he fact that . . . Curry is discussing another white male . . . during a recorded jail call was absolutely relevant and material to [Price's] defense." *Id.* "Trial counsel should have asked the law enforcement officers who testified at trial, particularly lead investigator [Glantz], whether they made any attempts to learn the identity of, or conduct any investigation of, the 'Little White Boy.'" *Id.* at 36-37.

Even if trial counsel was deficient for failing to investigate, obtain, or present evidence regarding the identify of "Little White Boy," and offering him up at trial as the white male assailant, Price cannot show prejudice. As stated previously, Nartey's description of the white male assailant (very short hair, white T-shirt with black markings) matched the appearance of one of the two people in the surveillance video, which was recorded around the time and location of the assault and robbery. Although Nartey could not identify the two people in the surveillance video, Officer Vocasek recognized, through "[f]acial features, body style, build, walk," one of the people in the surveillance video. According to Officer Vocasek, the appearance of the person was consistent with how Price looked when Vocasek saw him earlier that night, prior to the incident. Testimony from trial was that a gray shirt with black lettering was seized from Price's apartment during the execution of a search warrant, and Investigator Glantz testified that during the recorded jail call Price talked to Curry about the search and said they took his (Price's) gray shirt. (Investigator Glantz testified that during the execution of the search warrant, the gray shirt was found in the closet in Price's bedroom.) Additionally, Nartey identified Price in court as the white male assailant. Given the above evidence, Price has not shown a reasonable probability that the identification of "Little White Boy" would have been sufficient to undermine confidence in the outcome of trial. Because he cannot show prejudice, this ineffective assistance of counsel claim fails.

### (e) 404 Evidence

Price alleged that his appellate counsel was ineffective for failing to properly assign as error on direct appeal that trial counsel was ineffective for failing to object to improper 404 impeachment evidence. Price also alleged that appellate counsel was ineffective for failing to assign on direct appeal that the trial court erred by allowing improper 404 evidence to be introduced at trial.

Price argues that at trial, the State was allowed to repeatedly introduce, without objection from trial counsel, improper 404 evidence, improper impeachment evidence, and improper character evidence against Price. Neb. Rev. Stat. § 27-404 (Cum. Supp. 2022) prohibits the admission of character evidence to prove that a person acted in conformity therewith; or evidence of other crimes, wrongs, or acts to prove the character of a person in order to show that he or she acted in conformity therewith, but it may be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Price points to several instances at trial where evidence presented by the State placed Price "in a 'bad light' with the jury and left the jury with the impression that, given the repeated times [Price] had been contacted by law enforcement and photographed by law enforcement, [Price] had to have been a 'troublemaker.'" Brief for appellant at 38.

Specifically, when estimating Price's height in court, Officer McBride testified, "As I've seen him walk by me several times, I would estimate he's anywhere from five seven to five nine." Officer Vocasek testified that on the night of the assault and robbery, he was on foot patrol downtown and saw Price sometime before bar break at 2 a.m. Officer Vocasek knew Price prior to that night because they had spoken "[p]robably half a dozen [times]." Investigator Glantz testified that after some named suspects were developed from the "video surveillance stills," she matched them with "local photos we had of the named suspects," including Price; she also mentioned "book-in" photos to prepare a photo lineup. Investigator Glantz further testified about the execution of search warrants on Price's residence, mentioning that approximately 10 law enforcement officers were present "due to some individuals also needing transport[]"; she also testified that clothing was collected during the execution of the second warrant. Finally, Investigator Glantz testified that another named male was contacted "while investigating another crime that was attached to the search warrant."

Contrary to Price's claims otherwise, none of the above statements constituted 404 evidence, as none of the statements constituted the admission of other crimes, wrongs, or acts of Price. The statements by Officers McBride and Vocasek do not indicate familiarity with Price due to previous crimes. In particular, Officer Vocasek stated that he regularly conversed with people while on foot patrol downtown and that he and Price had chatted in the past, "shooting the breeze." Investigator Glantz' testimony about "individuals also needing transport[]" during the execution of the search warrant, and another named male being contacted "while investigation another crime that was attached to the search warrant," do not address other crimes, wrongs, or acts specifically related to Price. And finally, any reference to "local photos" or "book-in" photos, was minor and not unfairly prejudicial. See *Price I*, 306 Neb. at 58, 944 N.W.2d at 294 (officer's reference to "book-in photos" was minor in context of entire trial and not unfairly prejudicial).

Because none of the evidence complained of was impermissible 404 evidence, Price's claims regarding trial counsel's failure to object to the evidence and the trial court's allowance of the same, fail.

(f) Failure to Communicate

Price alleged that his appellate counsel was ineffective for failing to properly assign as error on direct appeal that trial counsel was ineffective for failing to properly communicate with Price prior to the second jury trial. In his motion for postconviction relief, Price claimed that trial counsel "never had sufficient time to discuss the case with affiant or to properly explain the general process of the trial." Price said that he "made many attempts to contact trial counsel through phone calls, text messages, and even showing up at his office asking to schedule a conference to discuss trial strategy," but counsel "either did not respond, refused to meet with [Price], only met [Price] for an insufficient amount of time, or refused to accept [Price's] phone calls." Price further argued that as the trial date approached, trial counsel assured him they would meet to discuss trial strategy but as each scheduled appointment arrived, counsel would cancel the appointment and reschedule; between January and June 2018, Price and trial counsel only met twice. "This resulted in trial counsel materially changing affiant's defense during the second trial," when, during opening statements, counsel "surprisingly admitted that [Price] was at the scene of the assault and robbery." "Trial counsel's unilateral decision to admit to the jury that affiant was at the scene when the crime was committed is stunning given the lack of any reliable corroborative evidence to establish that fact."

During opening statements at the second trial, defense counsel stated, "There were five people at the scene of this assault. . . . They were Mr. Price, Emmanuel Nartey, Stelson Curry, Patrick Pantoja, and someone else who we do not know. That is not in dispute." Counsel anticipated that Nartey would testify that one of the white males had no involvement in the assault and robbery. Counsel stated that Nartey gave a description of the white male assailant, but the description did "not fit" Price. Counsel "[did not] doubt" that Nartey would identify Price in court, but counsel "anticipate[d] that at the end of all the questions, his identification will not be reliable." Additionally, counsel stated that no fingerprint or DNA evidence tied Price to the assault and robbery, and "science doesn't lie." Counsel was "very confident" that after hearing all of the evidence, the jury would agree that the State had not met its burden of proof. During closing statements, defense counsel once again stated, "I told you at the beginning that we're not denying that James Price was there. We're denying that he was involved in this." Counsel reiterated the lack of scientific evidence, and that Nartey, the only eyewitness, had been inconsistent. According to counsel, Price was the white male who was not involved in the assault and robbery. Notably, during closing arguments of the first trial, defense counsel argued that Price could have been the white male that Nartey said was not involved in the attack. It was therefore not a new strategy for the defense to suggest that Price was present, but that he was the other white male who was not involved in the assault and robbery.

As noted by the district court, Price's only allegation of prejudice is that his counsel unilaterally decided to concede that Price was at the scene of the crime; but "the evidence presented at trial clearly placed [Price] at the scene of the assault." Nartey's description of the white male assailant (very short hair, white T-shirt with black markings) matched the appearance of one of the

two people in the Governor's Mansion's surveillance video; the video was recorded around the time and location of the assault and robbery. Although Nartey could not identify Price in the surveillance video, Officer Vocasek recognized one of the people in the surveillance video, and that the appearance of the person was consistent with how Price looked when Vocasek saw him earlier that night, prior to the incident. A gray shirt with black lettering was seized from Price's apartment during the execution of a search warrant, and Price identified the shirt as his in a recorded jail call with Curry. Additionally, Price had repeatedly changed his story to the police about his whereabouts the night of the assault and robbery. Finally, Nartey identified Price in court as the white male assailant. Thus, even if trial counsel was deficient by admitting that Price was present at the scene, Price cannot show prejudice because there is not a reasonable probability that the jury would have believed that he was not there. This claim of ineffective assistance of counsel fails.

### (g) Failure to Object to Prosecutorial Misconduct

Price alleged that his appellate counsel was ineffective for failing to properly assign as error on direct appeal that trial counsel was ineffective for failing to object to prosecutorial misconduct. In his motion for postconviction relief, Price specifically pointed to Nartey's testimony at the second trial that the white male assailant was wearing a white shirt "with black markings on the shirt," something Nartey had not previously disclosed. Trial counsel then cross-examined Nartey about the markings as previously discussed in this opinion. Price claimed that on redirect, the prosecutor asked Nartey if, during his May 2016, deposition, he was ever specifically asked whether the shirt had markings on it. Price alleged in his motion that,

> Nartey responded by saying that he was never asked about the existence of black lettering. This questioning by the prosecutor left the jury with the mistaken impression that the only reason Nartey did not previously disclose the existence of the black lettering in his prior statements was because he was never directly and specifically asked about other identifying features on the white shirt. **This is not a true statement** but yet the prosecutor played a role in procuring the statement anyways.

(Emphasis in original.)

Nartey's claim is refuted by the record. During redirect, the prosecutor asked Nartey if he was ever "asked whether the shirt had markings on it of any sort?" Nartey replied, "I don't remember." The following exchange then took place between the prosecutor and Nartey.

> Q. [Defense counsel] asked you this question and answer portion of your deposition from May 24, 2016. I want you to tell me if this sounds like an accurate recitation of the question and answer during the . . . deposition.
> A. Okay.
> Q. Question: "What was he wearing?"
> Answer: "White shirt."
> Question: "What kind of a shirt?"
> Answer: "It was a white T-shirt."
> Question: "What, do you know what kind of pants or shorts or any other part, article of clothing he may have had on?"

Answer: "No."

Did you hear that question and answer? Did you hear me read that to you?

A. Yes.

Q. Does that sound like an accurate portrayal of the question and answer that went on?

A. Yes.

Q. So as you sit here today, do you have an independent memory of there being black lettering on the white male's shirt?

A. Yeah, I remember there was some marks on the white shirt.

During closing arguments, the prosecutor repeatedly referred to Nartey's testimony that the white male assailant was wearing a white shirt with black markings on it.

Contrary to Price's assertion, during redirect, the prosecutor did not ask Nartey if, during his May 2016 deposition, he was ever specifically asked whether the shirt had markings on it, and, contrary to Price's assertion, Nartey did not respond by saying that he was never asked about the existence of the black lettering. Thus, Nartey's claim is refuted by the record. Because the question and answer did not take place as Price suggests, trial counsel did not fail to object to such alleged misconduct by the prosecutor, i.e., that the prosecutor mislead the jury regarding Nartey's statements pertaining to the clothing worn by the white male assailant at the time of the assault and robbery. Further, during closing arguments, the prosecutor's references to Nartey's testimony about the black markings did not constitute prosecutorial misconduct as it was a proper summation of the evidence presented at trial. This claim of ineffective assistance of counsel fails.

### 3. PROSECUTORIAL MISCONDUCT

Price assigns that the district court erred by denying his claims of prosecutorial misconduct without conducting an evidentiary hearing. In his motion for postconviction relief, Price alleged that he was denied due process because of prosecutorial misconduct. Specifically, he stated that the prosecutor engaged in prosecutorial misconduct by "not informing trial counsel prior to the second trial that Nartey was going to, for the first time, testify that he now recalls seeing black lettering on the white male assailant's shirt" and "by misleading the jury regarding Nartey's prior statements pertaining to the clothing worn by the white male assailant at the time of the assault and robbery"; and "engaging in improper bolstering of Nartey's testimony by repeatedly mentioning throughout multiple portions of the State's closing argument nonrelevant characteristics of Nartey in a blatant and inappropriate attempt for the jury to find him more credible." Because these claims of prosecutorial misconduct were either raised or could have been raised on direct appeal, they are procedurally barred. *State v. Lotter*, 311 Neb. 878, 976 N.W.2d 721 (2022) (when issue could have been raised on direct appeal, it is procedurally barred from postconviction relief, no matter how the issues may be phrased or rephrased).

### 4. MOTION AFTER ORAL ARGUMENT

After oral argument of this appeal, Price filed a "Motion to Correct Oral Argument Record," asking this court to correct the "inaccurate statements made by the State during oral arguments" questioning whether the vote tally from the first jury trial was contained in the

postconviction motion, when in fact, the alleged vote tally from the first jury trial was mentioned in Price's postconviction motion. Because Price's representation of the vote tally from the first jury trial does not alter the outcome of our analysis and has been clarified here, the motion is overruled as moot.

## VI. CONCLUSION

For the reasons stated above, we conclude that the district court did not err when it denied Price's postconviction claims without an evidentiary hearing. We therefore affirm the district court's order.

AFFIRMED.